```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:
                                    : Docket #18cr834
UNITED STATES OF AMERICA,
                                    :
            Plaintiff,
                                    :
         - against -
                                    :

DANIEL HERNANDEZ, et al.,           :  New York, New York
                                       November 19, 2018
            Defendants.             :

-------------------------------- :


                     PROCEEDINGS BEFORE
               THE HONORABLE HENRY PITMAN,
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          UNITED STATES ATTORNEY'S OFFICE
                         BY:  MICHAEL LONGYEAR, ESQ.
                              JACOB WARREN, ESQ.
                         One Saint Andrew's Plaza
                         New York, New York 10007

For Hernandez:           LAZZARO LAW FIRM, P.C.
                         BY:  LANCE LAZZARO, ESQ.
                         360 Court Street, Suite 3
                         Brooklyn, New York 11231

                         DAWN M. FLORIO LAW FIRM
                         BY:  DAWN FLORIO, ESQ.
                         3604 Broadway
                         New York, New York 10031


Transcription Service:   Carole Ludwig, Transcription Services
                         141 East Third Street #3E
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-<br>Direct**</u> | <u>**Re-<br>Cross**</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| <u>**Exhibit<br>Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir<br>Dire**</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                                                           3
 2              THE CLERK:   U.S. v. Daniel Hernandez.  Counsel,
 3   please state your name for the record.
 4              MR. MICHAEL LONGYEAR:   Good evening, Your
 5   Honor, Michael Longyear and Jacob Warren on behalf of the
 6   United States.
 7              MR. LANCE LAZZARO:   Lance Lazzaro for Daniel
 8   Hernandez.
 9              MS. DAWN FLORIO:   Good evening, Your Honor,
10   Dawn Florio of the Dawn Florio Law Firm representing Mr.
11   Daniel Hernandez.
12              THE COURT:   Mr. Hernandez, my name is
13   Magistrate Judge Pitman.  The purpose of this proceeding
14   is to inform you of certain rights that you have, to
15   inform you of the charges against you, to consider whether
16   counsel should be appointed for you, and to decide under
17   which conditions if any you should be released.  Can I
18   have the date and time of arrest please?
19              MR. LONGYEAR:   Yes, Your Honor, the defendant
20   was arrested last night, November 18, at approximately 7
21   p.m.
22              THE COURT:   Thank you.  Mr. Hernandez, you have
23   the right to remain silent.  You're not required to make
24   any statements.  Even if you have made any statements to
25   the authorities, you need not make any further statements.
```

4

1

2 Anything that you do say can be used against you.

3          You have the right to be released either

4 conditionally or unconditionally pending trial unless I

5 find that there are no conditions or combination of

6 conditions that would reasonably assure your presence in

7 court and the safety of the community.

8          You have the right to be represented by counsel

9 during all court proceedings including this one and during

10 all questioning by the authorities.  If you cannot afford

11 an attorney, I will appoint one to represent you.  It's my

12 understanding that you're currently being represented by

13 privately retained counsel.  I want to advise you that the

14 right to the appointment of counsel is an ongoing right

15 that you possess throughout these proceedings.  If at any

16 time you're unable to continue with retained counsel

17 because you run out of money, you can apply to the court

18 at any time for the appointment of counsel.  Do you

19 understand that?

20          MR. DANIEL HERNANDEZ:   Yes, Your Honor.

21          THE COURT:   Mr. Hernandez, you're charged in an

22 indictment in six counts.  Count 1 of the indictment

23 charges you with conspiring or agreeing with others to

24 violate the racketeering laws of the United States in

25 violation of Title 18 U.S.C. § 1962(d).  Count 2 of the

5

indictment charges you with carrying a firearm in

furtherance of a crime of violence that can be prosecuted

in federal court in violation of Title 18 U.S.C. § 924(c).

Count 3 charges you with committing a crime of violence in

aid of racketeering activity, namely, robbery that's

alleged to have occurred on April 3, 2018 in violation of

Title 18 U.S.C. § 1959.

Count 4 charges you with conspiring to commit a

crime, namely, assault with a dangerous weapon also in aid

of racketeering activity in violation of Title 18 U.S.C. §

1959.  Count 5 charges you with carrying a firearm in

furtherance of a crime of violence that can be prosecuted

in federal court in violation of Title 18 U.S.C. § 924(c).

And count 8 charges you with committing a crime of

violence in aid of racketeering activity, namely,

allegedly participating in a conspiracy to commit murder

in July of this year in violation of Title 18 U.S.C. §

1956.

Mr. Lazzaro, have your received a copy of the

indictment?

MR. LAZZARO:  I have, Your Honor.

THE COURT:  Have you reviewed it with your

client and do you waive its reading?

MR. LAZZARO:  So waived.

```
1                                                            6
2                THE COURT:   Okay.  Since the defendant has been
3     indicted, there will be no preliminary hearing, and that
4     takes us directly to the question of bail.  In that
5     regard, I have received a letter earlier this afternoon
6     from the Government addressing bail and seeking detention.
7     Mr. Lazzaro, I take it you've gotten that same letter, it
8     has three exhibits?
9                MR. LAZZARO:   I have not seen it at all, Judge.
10               THE COURT:   Do you have a copy for defense
11    counsel?
12               MR. LONGYEAR:   I do, Your Honor.
13               THE COURT:   All right.
14               (pause in proceeding)
15               THE COURT:   Take some time to review it.
16               (pause in proceeding)
17               MR. LAZZARO:   We're ready to proceed, Your
18    Honor.
19               THE COURT:   Mr. Longyear, when did you learn
20    that Mr. Lazzaro or Ms. Florio were going to be
21    representing Mr. Hernandez?
22               MR. LONGYEAR:   Your Honor --
23               THE COURT:   What time today did you learn that
24    they were going to be representing Mr. Hernandez?
25               MR. LONGYEAR:   We knew that Mr. Lazzaro
```

7

represented the defendant prior to today, Your Honor.  We

emailed a copy of this letter as it was, prior to being

hand-delivered to Your Honor.

THE COURT:  All right, I'll hear from the

Government first on detention.  Then I'll hear from

defense counsel.

MR. LONGYEAR:  Yes, thank you, Your Honor.

With respect to detention, Your Honor, the defendant

should be detained for both risk of flight and danger to

the community.  I will address risk of flight first as set

forth in the letter from earlier today.

The defendant is a famous rap artist, Your

Honor, and has substantial means.  Indeed, the defendant

frequently posts on social media accounts large sums of

cash, throws it around, he makes it clear that he makes a

lot of money.  We've seen financial records, Your Honor,

that shows the defendant regularly makes large cash

withdrawals, tens of thousands of dollars, in some

instances over $100,000 in cash in single withdrawals.

And that is important here because the indictment charges

the defendant with several violent crimes, and the

mandatory minimum here, Your Honor, is 32 years to be

served consecutively to any other sentence.

So there is, indeed, a significant incentive to

1

2  flee in this case, Your Honor, and the defendant has the

3  financial means to do it, and, indeed, the Pretrial

4  report, Your Honor, the probation department recommends

5  detention here, listing several factors with respect to

6  non-appearance including foreign familial ties, his

7  extensive foreign travel, and the means that he has, the

8  financial means, Your Honor.

9         Turning to danger to the community, Your Honor,

10  the letter details some of the facts underlying the

11  charges here in the indictment.  Several shootings and

12  other violent crimes beginning in or about April 3, Your

13  Honor, there was a gunpoint robbery of a rival gang member

14  in Manhattan, in Times Square.  This was done at around 5

15  p.m., Your Honor, still daylight.  Mr. Hernandez and his

16  codefendants, certain of his codefendants traveled from

17  Brooklyn to Manhattan and engaged in a gunpoint robbery of

18  the victims.

19         That robbery was captured on surveillance video.

20  The video shows one of the codefendants holding a gun.

21  And it's the Government's contention that Mr. Hernandez

22  was in the car parked outside of that robbery filming it

23  as it took place.  The Government would also submit that

24  witness testimony would show at trial that Mr. Hernandez

25  played a role in planning and directing that robbery, Your

1

2    Honor.

3          Turning to April 21, 2018, there were two

4    shootings that took place within hours of each other.  As

5    detailed in the letter, during the day the defendant was

6    with one of his codefendants in Brooklyn and a third

7    person.  They were shopping for clothes, they were at a

8    restaurant.  They got into a verbal altercation with two

9    individuals who were in a car, and shortly after that

10   verbal altercation, one of the codefendants got out of

11   their car, approached the other vehicle and fired two

12   rounds.  Again, that shooting is captured on surveillance

13   video, and the defendant can be seen getting out of the

14   car and watching his codefendants fire those rounds.

15          Later that night at the Barclay Center, the

16   defendant was with several of his codefendants.  He was

17   scheduled to perform, it was prior to a boxing match, and

18   at that event, Your Honor, the Government contends that

19   several of defendant's codefendants were armed going into

20   that event.  The defendant's codefendants engaged with a

21   rival gang member and a rival rapper.  They got into an

22   altercation, and one of the defendant's codefendants fired

23   a round.  And it's the Government's intention that Mr.

24   Hernandez was well aware of that shooting in advance of

25   the – or well aware that his codefendants were possessing

1

2  firearms in advance of that event.

3          And, indeed, after the shooting the defendant

4  took a video, either a live stream where he posted a video

5  of himself and his codefendants bragging about the

6  shooting and stating in sum and substance what happens,

7  that what happens when you engage with them, proud of that

8  shooting.  It's the Government's contention that that

9  shooting is part and parcel of promoting the gang activity

10  that underlies count 1.

11          With respect to the final shooting --

12          THE COURT:   And the gun was discharged inside

13  the Barclay Center?

14          MR. LONGYEAR:   It was inside the Barclay

15  Center, Your Honor.

16          THE COURT:   All right.

17          MR. LONGYEAR:   With respect to the final act of

18  violence set forth in the letter, Your Honor, in July it's

19  the Government's contention that the defendant directed

20  some of his codefendants to shoot at a rival, someone who

21  disrespected other members of the gang, I should put it

22  that way.  The shooting did take place where there was

23  gunfire in the evening of July 16 in a public housing

24  project in Brooklyn, and it's the Government's contention

25  that the defendant played a role in planning and directing

1

2 that shooting.

3        So, Your Honor, with respect to the acts of

4 violence and in particular the multiple acts of gun

5 violence that are charged in this indictment, the

6 penalties are severe, and it underscores the Government's

7 contention that the defendant is quite violent.

8        Turning – there's a reference as well, Your

9 Honor, to a search that was conducted at the defendant's

10 house in September of this year.  During that search law

11 enforcement agents recovered the proceeds of the robbery

12 that took place on April 3 in Manhattan, again, supporting

13 the fact that Mr. Hernandez played a role in that robbery.

14 More strikingly, Your Honor, is that the agents recovered

15 an AR-15 pistol from his residence, and that's important,

16 Your Honor, because, as the Court's aware from the

17 Pretrial report, that defendant was a convicted felon, had

18 entered into a plea agreement with the district attorney's

19 office, and that gun obviously, as displayed in exhibit A,

20 Your Honor, it's quite a dangerous weapon.

21        Your Honor, there are other events outside --

22        THE COURT:   I'm just curious, is there a reason

23 why he was not apprehended when the gun was recovered in

24 September?

25        MR. LONGYEAR:   Your Honor, the gun had been

1

2  seized by law enforcement, and this investigation was

3  ongoing.

4          THE COURT:  All right, go ahead.

5          MR. LONGYEAR:  More recently, Your Honor, the

6  defendant on April 26 appeared in New York State Supreme

7  Court for sentencing of his underlying conviction.  Sorry,

8  if I misspoke, October 26, Your Honor.  At that hearing

9  the defendant was sentenced to four years' probation.  One

10 of the conditions, it's the Government's understanding,

11 was that he was not to associate with gang members.  Two

12 hours later the defendant is with two of his codefendants

13 on the upper east side to meet with one of his music

14 managers.  His codefendants got into an altercation with

15 the music manager's security, a fight broke out, a chair

16 was thrown, and one of his codefendants was shot.

17         Your Honor, the Government's investigation --

18         THE COURT:  The sentencing on October 26 was

19 for what offense?

20         MR. LONGYEAR:  That was for the sexual

21 performance of a child --

22         THE COURT:  I see.

23         MR. LONGYEAR:  -- charge, Your Honor.

24         THE COURT:  Okay.  All right, go ahead.  You

25 were telling me about the altercation with the security --

```
 1                                                          13
 2              MR. LONGYEAR:   Yes, Your Honor, but the
 3   defendant was not present for that altercation, but what
 4   was important was that he was with his two codefendants,
 5   two known gang members, hours after he was directed by a
 6   state court judge not to associate with gang members.
 7   Indeed, four or five days later --
 8              THE COURT:   He was not present for the
 9   altercation that resulted in the shooting?
10              MR. LONGYEAR:   He was there, and it's the
11   Government's understanding he left the restaurant, and
12   then his codefendants came back and the altercation --
13              THE COURT:   I see.  Okay, go ahead.
14              MR. LONGYEAR:   Your Honor, finally, the
15   Government's investigation of this case included wiretap
16   interceptions of some of his codefendants, and, again,
17   after that April, sorry, October 26 order, the defendant
18   can be, his voice was captured over that wiretap talking
19   with certain of his codefendant who are well-known gang
20   members, Your Honor.  They are members of the Nine Trey
21   Gangster Bloods which is a violent set underneath the
22   United Bloods Nation which was formed in 1993 in Rikers
23   Island.
24              So, Your Honor, I think those recent acts show
25   the defendant's blatant disregard for court orders.  As
```

14

the Court's aware, this is a presumption case.  There are

multiple acts of violence, that the defendant was indicted

by a grand jury.  He's facing a significant term of

incarceration, maximum of life with a mandatory minimum of

32 years, and has substantial means.  So for all of those

reasons --

THE COURT:  Can you just review for me how you

calculate the mandatory minimum of 32?

MR. LONGYEAR:  Yes, Your Honor.  It would be

seven years on the brandishing in connection with the

April 3, charged as an assault but was a gunpoint robbery,

state robbery.  And then 25 years under 924(c)(1)(c) for

the discharge in furtherance of the RICO conspiracy.

THE COURT:  Okay.  Anything else?

MR. LONGYEAR:  So for all those reasons, Your

Honor, the Government contends the defendant is a flight

risk as well as a danger to the community.

THE COURT:  All right, thank you.  Mr. Lazzaro,

go ahead.

MR. LAZZARO:  Judge, I think the Government

with this indictment is really stretching it in a way,

Judge, that I can understand with respect to the

codefendants in this case, but I really don't understand

it with respect to Daniel Hernandez.  Because in the

1

2   indictment they say that this racketeering conspiracy went

3   from 2013 up until November of 2018.  Let's be clear here,

4   Judge, Daniel Hernandez did not get involved with any of

5   these individuals, Judge, until September of 2017.

6           How did he get involved with some of these

7   individuals, Judge?  He's at a concert.  He's a rapper.

8   These people end up approaching him.  He ends up hiring

9   them, some of these members, two of the members as

10  security for him.  That doesn't make you guilty of

11  committing a criminal act, Judge.  But that's how he

12  became involved with at least two of the alleged

13  coconspirators here, Judge. So when they allege that this

14  racketeering organization or this conspiracy went on for a

15  five-year period, the prosecutor is not being accurate

16  because his only involvement with some of these

17  individuals doesn't occur until a year ago, Judge.

18          And what does he do, Judge?  He's a rapper.  He

19  ends up hiring a couple of these people as a manager and

20  part of his security team.  There's nothing wrong with

21  that, Judge, that doesn't mean you're guilty of a crime by

22  hiring these people.

23          So if I look at this conspiracy, they talk about

24  an incident that happened on April 3, and they submitted

25  videos to the Court or still shots.  All I see on the

```
 1                                                          16
 2   still shots are other people committing this crime, this
 3   robbery charge, Judge.  I don't see Daniel Hernandez or
 4   Tekashi69 as he's known on any of those still images.  And
 5   they could argue, well, he was sitting in a car.  That
 6   doesn't mean you're guilty of a crime, even assuming their
 7   position here, Judge.  You have to have something more
 8   than allegedly mere presence when you're not even in when
 9   the act of the robbery occurs.
10            So they may look at it as an April 3 incident
11   that he's involved with it, but the New York City Police
12   Department never arrested him on April 3, never went to
13   his home, never questioned him.  And so here it is now,
14   Judge, the federal government now is alleging that he's
15   involved with that incident even though when the state
16   police investigated that incident, he's never questioned,
17   charged, or anything.
18            We then speak about the April 21 incident,
19   Judge, with respect to allegedly two shootings --
20            THE COURT:   I appreciate that mere presence and
21   even presence with knowledge is not an offense, is not a
22   crime, but the Government's proffer is that he accompanied
23   the other individuals, actually he directed the other
24   individuals to the alleged robbery that took place on
25   April 3, 2018.  I mean is it your contention his presence
```

17

there, if he was present, was accidental?

MR. LAZZARO:   Whether he was present there,
Judge, or not, he had nothing to do with what happened
with any other individuals, if, in fact, it's true.  But
they submitted to this Court he never directed them to rob
an individual or participated in that, Judge.

And with respect to these three incidents that
they're talking about, April 3, April 21, and July 16, and
I think the July 16 is a very serious charge, he wasn't
even in the State of New York at that time.  He was in
Houston, Judge, Texas when the July 16 incident occurred.
Yet they're charging him with acting in concert as part of
this case where somebody attempted to murder somebody and
an innocent bystander was shot.  He wasn't even in New
York, Judge.  Yet they have now put it in front of this
Court that he participated in this when he was in Houston,
Texas and left Houston, Texas and went to California for a
video shoot.

I look at the April 21 incident, Judge.
Somebody was arrested on that incident.  Again, Judge, he
wasn't arrested, wasn't spoken to by the police.  He's at
a boxing match at Barclay Center and with 20,000 other
people at that boxing match.  Yet all of a sudden New York
City Police Department says he didn't do anything wrong,

```
 1                                                        18
 2  yet he's now being --
 3            THE COURT:   Where did the New York City Police
 4  Department say he didn't do anything wrong?
 5            MR. LAZZARO:   He never was charged, Judge.   A
 6  person was arrested for that --
 7            THE COURT:   Not being charged is not saying
 8  someone didn't do anything wrong.
 9            MR. LAZZARO:   Judge, if there was any
10  involvement, and I've seen the video --
11            THE COURT:   Is there any statement by a police
12  department official --
13            MR. LAZZARO:   No.
14            THE COURT:   -- that he hasn't done anything
15  wrong?
16            MR. LAZZARO:   No.   Judge, but --
17            THE COURT:   But that statement's hyperbolic,
18  isn't it?
19            MR. LAZZARO:   (indiscernible) I've seen the
20  video of him when the shooting allegedly occurred.   He's
21  nowhere involved in any of that.   So based on those
22  things, Judge.
23            I want to argue with respect to --
24            THE COURT:   You say there's a video of the
25  shooting that allegedly took place in April?
```

```
                                                               19
 1
 2              MR. LAZZARO:   Oh, yeah, inside the thing, and

 3   he's not involved in it.

 4              THE COURT:   Well, do you want to continue so I

 5   can review the video or - I presume you don't have the

 6   video with you.

 7              MR. LAZZARO:   I don't have it with me, Judge,

 8   but I would like to get onto --

 9              THE COURT:   Well, do you want a continuance so

10   that I can view the video?

11              MR. LAZZARO:   No, Judge, I'd like to - I'm

12   going to propose something, Judge, in a few minutes.  I

13   want to speak about the risk of flight, Judge.  He had a

14   case in Manhattan, Judge, that he got sentenced on October

15   26.  So when the prosecutor just argued a few minutes ago

16   he was a convicted felon, he wasn't a convicted felon, and

17   he wasn't sentenced until October 26, and he received

18   youthful offender treatment.  So I don't know when the DA

19   says that during all of this he was a convicted felon and

20   engaging in this conduct, he had an open sentence where he

21   completed it substantially, everything the judge asked him

22   to in Manhattan, and he wasn't sentenced until October 26.

23              But, Judge, he was, he had concerts in Europe

24   where he came back to court knowing he had an open

25   sentence.  He had concerts in California, throughout the
```

20

1    United States.

2           THE COURT:   What was the maximum penalty he

3    faced on the matter for which he was sentenced on October

4    26?

5           MR. LAZZARO:   He faced under the plea agreement

6    he could've gone away for up to 1 1/3 to 4 years in jail.

7           THE COURT:   Okay, 1 1/3 to 4, 15 months to 4

8    years.

9           MR. LAZZARO:   Correct.

10          THE COURT:   Okay, go ahead.

11          MR. LAZZARO:   But, Judge, every time he was

12   told to come back to court, he came back throughout that

13   two-year period, Judge.  So I would argue, Judge, even

14   with all these huge sums of cash, every time he was told

15   to come back, he came back pursuant to a judge's order.

16   So I don't look at him as a risk of flight in any way,

17   Judge, because he had a case for well over a two-year

18   period, and he always came back.

19          And even with these large sums of cash, Judge,

20   that didn't stop him from coming back to court.  He's in

21   an industry where if you become famous, which is what he's

22   become, you end up making a good sum of money, Judge.  But

23   that doesn't mean you're a risk of flight.  He's a United

24   States citizen, his mother is in this courtroom, Judge,

1

2  his brother is in this courtroom, he entire family is in

3  this courtroom.  And he is a United States citizen.  So I

4  just think the argument that because he has large sums of

5  money with no warranty history whatsoever is a

6  disingenuous argument.

7           I understand the danger to the community

8  argument, Judge, but I would urge this Court, Judge, that

9  there's nothing where he ever brandished a gun and shot it

10  on these three incidents --

11          THE COURT:  They recovered a gun from his

12  apartment, did they not?

13          MR. LAZZARO:  Judge, he wasn't living there any

14  longer.  What's interesting about that, Judge, is that he

15  was in Europe --

16          THE COURT:  Was it his apartment?

17          MR. LAZZARO:  Not at that time.  He moved out.

18          THE COURT:  Whose apartment was it?

19          MR. LAZZARO:  That was a previous apartment

20  that they had rented.  He had moved out of that --

21          THE COURT:  I'm sorry, who's the they?  When

22  you say that was a previous apartment that they had

23  rented, who's --

24          MR. LAZZARO:  That the family had rented.  And

25  so, but they moved out already, Judge.  They were living

in a different location at that time.  He wasn't even here

when the federal government, the FBI agents --

THE COURT:   When did they move out, when did

the family move out of the apartment?

MR. LAZZARO:   They moved out in August of 2018,

Judge, and, in fact, Judge, I have the lease with me,

Judge, which - when they moved to Long Island in Lido

Beach where they had already moved out.

THE COURT:   When did the lease on the apartment

terminate?

MR. LAZZARO:   The old lease?

THE COURT:   The lease on the apartment, when

did it terminate?

MR. LAZZARO:   Where the Government has

recovered?

THE COURT:   Yeah, what was the lease term?

MR. LAZZARO:   According to my client, it was a

month-to-month tenancy in that Brooklyn address that he

moved out.  However, they did sign a lease, Judge, which I

have a copy of the written lease, Judge.  Your Honor, he

had moved out of that location.

Judge, one other thing you should note, Judge,

if he's such a danger to the community, and I didn't

really want to get into this argument here but I think it

23

1

2  has to be raised at this point, he gets picked up by the

3  police, by the FBI on Saturday, Judge, not yesterday.  He

4  gets picked out on Saturday.  They come to his home and

5  they say we think there's credible threat against your

6  life right now, and we want you to come with us.  They

7  take him to the FBI building in Manhattan, this is on

8  Saturday night, Judge.  I went there, and they start

9  telling him there's a credible threat, that they think

10  somebody's going to hit you.

11         The threat that they believe is going to happen,

12  Judge, although the FBI agents are not telling me where

13  the threat is coming from.  Two of his codefendants that

14  are on this indictment he had fired in the last week and a

15  half, Judge.  He had thrown them out of his, of being part

16  of his management and as being part of his security.  He

17  knew that there was a problem with these two individuals.

18  He fires them, he goes on a huge breakfast show on Friday

19  and announces to the world that he's fired everybody

20  surrounding him that he thinks is a bag apple.  They're

21  thrown out of his business.  He's caught them stealing

22  from him and everything else.  So now I believe those

23  individuals that may be part of this are where the threat

24  is coming from.

25         So we go to the FBI office on Saturday, Judge.

The FBI agents offer him this type of arrangement.  They

say you can go home, Mr. Hernandez, but we want to watch

you 24 hours, meaning that we want to have security at

least until Tuesday or Wednesday, and then we'll reassess

the danger.  Mr. Hernandez decides he doesn't want

security, and he actually signs a waiver with the agents

at that time where he says if anything happens to me, I'll

be responsible for it.  If he's such a threat to the

community, Judge, on Saturday, they let him walk out of

that building.

I'm not so sure that this now demand of putting

him in detention is a kind of a misguided position of the

U.S. Attorney at this stage because he walks out of there

on Saturday, I don't know what changed between Saturday

and Sunday that now all of a sudden on Sunday they come

back to him and they chose to arrest him on Sunday.  What

information changed between Saturday and Sunday, Judge?

You can't put somebody in jail because you chose not to

take the FBI's protection.  Now, they may say that they're

doing it for his protection, we want him in jail.  But if

he's such a danger to the community, why did they let him

walk out of the FBI building with me on Saturday night?

I think, Judge, what I'm proposing to this

Court, Judge, is this, is twofold, one that I think

                                                                    25

1  addresses his risk of flight --

2          THE COURT:   Before we get to your proposal,

3  just a couple of questions about - the apartment where the

4  gun was found, was that on Locust Street, 18 Locust

5  Street, Apartment 1L in Brooklyn?

6          MR. LAZZARO:   No, Cambridge.  It was on

7  Kingston Avenue, Judge, right off of Atlantic Avenue.

8          THE COURT:   And the lease that you were

9  proffering before, is that the lease for Locust Street?

10         MR. LAZZARO:   I have both leases, Judge.

11         (pause in proceeding)

12         MR. LAZZARO:   Judge, here is the lease for the

13 address he's been living at in Brooklyn.

14         THE COURT:   So that's the Locust Street

15 address?  Just show it to Mr. Longyear first, okay,

16 please.

17         (pause in proceeding)

18         MR. LAZZARO:   I also have the lease, Judge, for

19 where he moved his parents out, his mother and brother and

20 he also stays at in Long Island.  He had moved out of that

21 property on Kingston Street --

22         THE COURT:   All right, just one second, let me

23 see the leases for a minute.  Just give me a minute to

24 look at them, then you can continue.  Okay?  Thank you.

1

2          (pause in proceeding)

3          THE COURT:   Let me just ask you a question or

4     two, Mr. Lazzaro.  The two leases that you handed up, one

5     is for a premise in Lido Beach, and if I'm reading these

6     correctly, the second is for a premise on Ainslie Street

7     in Brooklyn.  And according to the Pretrial Services

8     report, Mr. Hernandez told Pretrial that he's lived on

9     Locust Street his entire life and currently lives there

10    with his mother and sibling and that he will continue to

11    reside at that residence if he's released on bail.  He

12    also indicated for the past five months he has been

13    staying at the Lido Beach address which is a residence he

14    currently rents.

15         MR. LAZZARO:   What ended up happening --

16         THE COURT:   What - according to this, he told

17    Pretrial he lived on Locust Street.

18         MR. LAZZARO:   He does.  What ended up happening

19    is that after October 26, when the judge in Manhattan,

20    Judge Menin, sent him to probation for a four-year period,

21    probation wanted him to move back to the Brooklyn address

22    full time.

23         THE COURT:   Which Brooklyn address?

24         MR. LAZZARO:   Locust Street.  He ended up

25    moving back to Locust Street, Judge, just in the last

1
2  month.

3          THE COURT:   Why did the judge want him moving

4  back to that particular address in Brooklyn?

5          MR. LAZZARO:   I think at that time they could

6  not supervise him in Long Island because it was outside of

7  New York City.

8          THE COURT:   No, but you've handed up a lease

9  for Ainslie Street in Brooklyn which is also in New York

10  City.  I mean which is the address, is it Ainslie Street

11  or Locust Street?

12          MR. LAZZARO:   It's Locust Street, Judge.

13          THE COURT:   Then what does – the lease for the

14  Ainslie Street premises have any relevance?

15          MR. LAZZARO:   They were thinking of moving into

16  that location, and then they changed it to Locust Street

17  after he was sentenced on October 26.

18          THE COURT:   So he never lived on Ainslie

19  Street?

20          MR. LAZZARO:   He ended up leasing it, but I

21  don't think he ever moved in.  He never moved into it,

22  Judge.

23          THE COURT:   So the only Brooklyn residence he's

24  had has been on Locust Street?

25          MR. LAZZARO:   Yes.  Well, not – originally it

28

1  was Kingston, Judge.  He moved out of Kingston, went to

2  Long Island.  When he was sentenced in October, he had to

3  come back into the New York City area.  He was going to

4  live on Ainslie Street but decided to change it to Locust,

5  if that makes sense.

6          THE COURT:  The statement that he lived in

7  entire life on Locust Street and intends to live there if

8  released on bail and that he lives there with his mother

9  and his sibling, is that accurate or inaccurate?

10          (pause in proceeding)

11          MR. LAZZARO:  Apparently, that's the family

12  apartment that he never gave up and he ended up moving

13  back.  That's where he actually grew up in with his

14  parents and his brother.  So he never gave that apartment

15  up and ended up moving back to it, Judge, when he was put

16  on probation in October.  He never stopped paying the rent

17  on it.

18          THE COURT:  And he never stopped living there?

19  Well, did he stop living there?

20          MR. LAZZARO:  Right now, presently, he does.

21  He went --

22          THE COURT:  No, did he ever stop living, did he

23  ever stop residing at Locust Street?

24          MR. LAZZARO:  When he started to become famous,

28

1  was Kingston, Judge.  He moved out of Kingston, went to

2  Long Island.  When he was sentenced in October, he had to

3  come back into the New York City area.  He was going to

4  live on Ainslie Street but decided to change it to Locust,

5  if that makes sense.

6          THE COURT:  The statement that he lived in

7  entire life on Locust Street and intends to live there if

8  released on bail and that he lives there with his mother

9  and his sibling, is that accurate or inaccurate?

10          (pause in proceeding)

11          MR. LAZZARO:  Apparently, that's the family

12  apartment that he never gave up and he ended up moving

13  back.  That's where he actually grew up in with his

14  parents and his brother.  So he never gave that apartment

15  up and ended up moving back to it, Judge, when he was put

16  on probation in October.  He never stopped paying the rent

17  on it.

18          THE COURT:  And he never stopped living there?

19  Well, did he stop living there?

20          MR. LAZZARO:  Right now, presently, he does.

21  He went --

22          THE COURT:  No, did he ever stop living, did he

23  ever stop residing at Locust Street?

24          MR. LAZZARO:  When he started to become famous,

1                                                             29

2   Judge, it really happened in October of last year, he

3   started staying at different apartments in Brooklyn

4   because he was --

5            THE COURT:   Did he still get mail at Locust

6   Street?

7            MR. LAZZARO:   All his mail still is addressed

8   to the Locust Street.  Everything goes to Locust, his

9   credit cards, his passport, everything, Judge.

10           THE COURT:   So is that still his primary

11  residence?

12           MR. LAZZARO:   Yes.

13           THE COURT:   All right, go ahead.

14           MR. LAZZARO:   So with respect to, Judge, what I

15  was going to propose is this, Judge, to take away – I

16  don't believe he's a risk of flight because he always

17  comes back to court, and I don't think the sums of money

18  has made him a risk of flight because, as I told you, he

19  always came back.

20           What I'm proposing, Judge, is for him to deposit

21  $750,000 into court.  I'm also proposing that he surrender

22  his passport.  I'm also proposing, Judge, that he goes

23  under house arrest or home confinement, which, Judge,

24  number one, it's a substantial bail, 750,000 we would

25  deposit into the court.  We would agree that he's under

```
 1                                                    30
 2  home confinement, and we would also surrender his
 3  passport.  He would not be on the streets of Brooklyn or
 4  anywhere at this stage.  And that's what I'm proposing.
 5            THE COURT:   Okay, anything else you want to
 6  tell me?
 7            MR. HERNANDEZ:   No, Your Honor.
 8            MR. LAZZARO:   No, Your Honor.
 9            THE COURT:   Mr. Hernandez, it's far better if
10  you talk to Mr. Lazzaro and let Mr. Lazzaro do the
11  speaking or Ms. Florio, either one.
12            MR. HERNANDEZ:   Okay.
13            THE COURT:   But it's far better to let your
14  attorney speak for you than for you to speak directly to
15  the Court.  All right, does the Government want to
16  respond?
17            MR. LONGYEAR:   Yes, Your Honor.  Your Honor,
18  first of all --
19            THE COURT:   Where was the gun recovered?
20            MR. LONGYEAR:   The gun was recovered from 31
21  Kingston, you know, and it was the first point I wanted to
22  address was the defendant was in the process of moving
23  out, there's no question.  His family members were there
24  at the house actually when the agents from NYPD, Homeland
25  Security investigation, and ATF executed the search.  But
```

it's the Government's contention that that was --

THE COURT:   Did it still appear that people lived there when they executed the search at 31 Kingston?

MR. LONGYEAR:   They were - the Government concedes, Your Honor, that they were in the process of moving out.  There were boxes, there were moving boxes, but the gun was recovered there, and significantly as well, the proceeds from that April 3 robbery were also in the house.

THE COURT:   The proceeds consisting of the backpack.

MR. LONGYEAR:   The backpack and the contents of the backpack, Your Honor.

THE COURT:   What were the contents of the backpack?

MR. LONGYEAR:   Credit cards, identification information of one of the rivals.

THE COURT:   All right.

MR. LONGYEAR:   Your Honor, with respect to defense counsel's discounting some of these acts of violence, I think the law is very clear here under Rosemund that if the defendant has knowledge that acts of violence will take place and that guns are involved, he's on the hook for the 924(c), Your Honor, if he has advance

knowledge that --

THE COURT:   I'm sorry?

MR. LONGYEAR:   If he has advance knowledge that his codefendants have guns and they planned to engage in certain acts of violence, here a robbery, a shooting, he is on the hook on the 924(c) liability if he aids and abets.

THE COURT:   If there's a conspiracy.

MR. LONGYEAR:   Right, if there's a conspiracy and as an aider and abettor.

THE COURT:   Well, knowledge alone is not aiding and abetting.

MR. LONGYEAR:   Right, but he's also, if he also --

THE COURT:   You need some overt – you need some --

MR. LONGYEAR:   Correct --

THE COURT:   -- actus reus is what they used to call it.

MR. LONGYEAR:   And it's the Government's contention that with respect to the April 3 robbery, he directed, he helped plan and direct the robbery.  Indeed, as the letter I submitted to Your Honor earlier today sets forth this was planned.  The victim was live streaming

1

2  before he went into the building where he was eventually

3  robbed.  The defendant and others left from Brooklyn,

4  drove to Midtown, waited outside that building for the

5  victims to leave, and then perpetrated the robbery at

6  gunpoint.

7            With respect to the July 16 act of violence, the

8  shooting, it's the Government's contention that the

9  defendant directed the shooting happen.  Even if he

10  weren't in New York, Your Honor, there are other ways

11  including telephone, Facetime, Whatsapp, there are way to

12  communicate that the shooting take place which is the

13  Government's contention that's what happened here on July

14  16.

15            I've already addressed the April 21 shootings.

16  The evidence is clear, the surveillance video, the

17  defendant's presence and his boasting about the shooting

18  after it takes place at the Barclay Center.  And, again,

19  it's the Government's contention that the evidence will

20  show that the defendant was well aware that his

21  codefendants possessed guns going into the Barclay Center.

22            Briefly, on the package, Your Honor, and I think

23  Your Honor's questions to defense counsel highlighted the

24  issue.  The defendant's prior liability was one to four

25  years.  He's facing a 32-year mandatory minimum sentence,

34

Your Honor, a maximum of life imprisonment.  He has a significant reason to flee.  And as he boasts on social media and in interviews including this Friday interview, he makes, he has appearances in Europe, in the Middle East, he goes on tours.  He makes several hundred thousand dollars and more per appearance.  So, Your Honor, he has every incentive to use the substantial means that he has to flee to avoid this sentence.

But, most importantly, Your Honor, he's a member of a violent set of the Bloods that just as alleged in the indictment, notwithstanding this five-year conspiracy (indiscernible) that Mr. Lazzaro highlighted, in the last seven months we've highlighted several shootings, public shootings in the middle of the day.  At 5 p.m. there's a gunpoint robbery brandished in Midtown Manhattan.  April 21, still light outside, there's a shooting on a busy street in Brooklyn.  Later that night a shooting at the Barclay Center, inside the Barclay Center, and a shooting on July 16 at a barbecue cookout in the summertime where a person was hit.  The defendant is violent, Your Honor.

And with respect to what Mr. Lazzaro was talking about, the events of this past weekend, to be clear --

THE COURT:  Did the FBI take him to their office, to its office on Saturday evening or Saturday at

                                                                      35

1

2   some point?

3          MR. LONGYEAR:   So, Your Honor, the Government

4   has been investigating the defendant for some time.   Mr.

5   Lazzaro's correct that on Friday the defendant went on a

6   radio program and made certain derogatory statements about

7   other Bloods members and about some of his codefendants

8   whom he fired.   As I mentioned earlier, the Government was

9   up on a wiretap on one of his codefendants and intercepted

10  phone calls between some of his codefendants saying that

11  they wanted to, quote, "violate him," to super violate

12  him, which the Government understands means that there

13  were authorizations to take violent acts against the

14  defendant including shooting him.

15         THE COURT:   And those calls were intercepted

16  when?

17         MR. LONGYEAR:   Those calls were intercepted

18  Saturday afternoon, Your Honor.   With that information,

19  NYPD reached out to defendant, advised him that there was

20  a credible threat, and he was taken to HSI's office in

21  Manhattan and met with members of ATF, HSI, and NYPD to

22  discuss these threats.   The agents offered him protection

23  in the form of staying at an apartment or hotel.   The

24  defendant wanted to have people stay at multiple hotels

25  which was not an option.   The defendant then ultimately

1
2  declined the protection of law enforcement.

3          Your Honor, the reason we are here --

4          THE COURT:   And he was allowed to go home on

5  Saturday?

6          MR. LONGYEAR:   He signed a declination, a

7  waiver of liability, and was allowed to go home, but it

8  wasn't as if law enforcement wasn't conducting round the

9  clock surveillance of him.   There were multiple unmarked

10 cars, and any time the defendant's presence was known in

11 the City, a marked car was placed at his location because

12 of the violence surrounding this defendant.

13          On Sunday, the defendant was at his apartment.

14 He went to a hotel in Manhattan.   He was trailed by law

15 enforcement officers.   But the law enforcement got

16 information that the defendant was planning to go to

17 Foxwoods Casino, a venue that they could not control, and

18 the determination was made that we should take the case

19 down and start to arrest several of our targets including

20 the defendant.   That is why we're here today, Your Honor,

21 and we are here --

22          THE COURT:   Hold on one second.   Why could not

23 federal agents picked him up in Connecticut?   Foxwoods is

24 in Connecticut, is it not?

25          MR. LONGYEAR:   It is, Your Honor.   They picked

1
2  him as he was leaving.

3          THE COURT:   Right, but you said, you seemed to

4  be - I think the words you used were if he went to

5  Foxwood, it would be a place beyond their control.  Why

6  would it be beyond the control of federal agents?

7          MR. LONGYEAR:   Law enforcement was aware of

8  phone calls over a wiretap that certain high-ranking

9  members of the Bloods that had authorized violence against

10  the defendant.  That was the only call we were aware of.

11  We weren't aware of if there were other orders going out

12  to other members of the Bloods set --

13          THE COURT:   No, but those were the calls on

14  Friday, right?

15          MR. LONGYEAR:   Saturday.  Saturday afternoon,

16  late Saturday afternoon.  And so, Your Honor, law

17  enforcement at that time sees this as an active threat.

18  There could be random shootings.  Indeed, in Beverly

19  Hills, about a week ago, the defendant was filming a music

20  video at a home in Beverly Hills and two people --

21          THE COURT:   What I'm trying to understand is

22  what changed between Saturday and Sunday --

23          MR. LONGYEAR:   He was going to - as opposed to

24  being at his apartment and staying in place with law

25  enforcement agents outside his door, he would be traveling

1

2   and going to a public place, Your Honor.  As I was

3   continuing, the Beverly Hills incident, he's filming a

4   music video, and this is well documented, it's in the

5   press, and two individuals shot ten rounds into the house

6   where he was filming.  So law enforcement made a --

7           THE COURT:   I'm trying to - that may show that

8   he's at risk, but how does that demonstrate dangerousness

9   on his part.

10          MR. LONGYEAR:   I was attempting, Your Honor, to

11  address the situation that happened over the weekend and

12  why the events took place in the manner in which they took

13  place.

14          That being said, as alleged in the indictment,

15  this defendant participated in multiple acts of violence,

16  multiple shootings and a gunpoint robbery, Your Honor.

17  He's a member, a self-proclaimed member of the Nine Trey

18  Gangster Bloods.  So, Your Honor, there are no set of

19  conditions that would ensure the public's safety with

20  respect to this defendant, and --

21          THE COURT:   With respect to danger, danger to

22  the community, did anything change between Saturday and

23  Sunday?

24          MR. LONGYEAR:   There were active threats

25  against the defendant, Your Honor.

THE COURT:   I mean, no, that doesn't bear – I

don't think that bears on Mr. Hernandez's danger to the

community.  With respect to whatever danger Mr. Hernandez

posed to the community, did anything change between

Saturday and Sunday?

MR. LONGYEAR:   The location of the defendant

changed, Your Honor, but, frankly, I think the Government

was in a position to charge the case rather rapidly, and,

indeed, the way that this transpired today is we had to

conduct probable arrests throughout last night.

THE COURT:   So the answer to my question is?

MR. LONGYEAR:   In all likelihood, we would have

charged this case this week probably anyway --

THE COURT:   You still haven't answered my

question.

MR. LONGYEAR:   What has changed?

THE COURT:   Did anything with respect to the

danger that Mr. Hernandez poses to the community, did

anything change between Saturday and Sunday?

MR. LONGYEAR:   There were multiple calls over

the wire, Your Honor, discussing violence as to this

defendant.  So law enforcement --

THE COURT:   Violence against Mr. Hernandez.

MR. LONGYEAR:   Against Mr. Hernandez.

```
 1                                                    40
 2            THE COURT:   Okay, with respect to the risk of
 3   danger that Mr. Hernandez posed to the community, did
 4   anything change between Saturday and Sunday?
 5            MR. LONGYEAR:   No, Your Honor, but law
 6   enforcement at least was able to contain that threat by
 7   maintaining a 24-hour presence with multiple unmarked and
 8   marked vehicles outside his house.
 9            MR. LAZZARO:   You know, Judge, I was there --
10            THE COURT:   Okay, anything - just one -
11   anything else you want to tell, Mr. Longyear?  I'm going
12   to give you a chance to speak again, but let me finish
13   with the Government first.  Anything else, Mr. Longyear?
14            MR. LONGYEAR:   No, Your Honor.
15            THE COURT:   Okay, go ahead.
16            MR. LAZZARO:   Had Mr. Hernandez agreed, Judge,
17   on Saturday night, and I was there for three hours with
18   him, had he agreed to go into a hotel room or go into his
19   home and take their protection, I would argue, Judge, that
20   there would never have been an arrest yesterday.  The DA's
21   position or the prosecutor's position is because he did
22   not take protection from the Government, that since the
23   codefendants posed a threat to his life, he should now be
24   remanded, not that he left on Saturday night and got
25   arrested on Sunday because he posed a threat to other
```

1
2  people.  The codefendants posed a threat to him, Judge.

3           Which is interesting here, and what the

4  Government just seems to gloss over is that he renounced

5  everybody on Friday of last week.  He threw them out last

6  week out of his business.  He fired everybody.  He

7  renounced them publicly on a radio show.  He renounced any

8  type of involvement with any of his codefendants, two of

9  the codefendants that Your Honor saw earlier.

10          I'm arguing, Judge, that he's not a danger to

11 the community, that the conditions that I have proposed,

12 Judge, are sufficient, Judge, where he would basically be

13 agreeing to what they proposed on Saturday night.  They

14 were happy with him going home to his home and staying

15 there and not going out.  I'm proposing exactly the same

16 thing today, Judge, except that I'm asking, I'm offering

17 to put up $750,000 in cash in addition to agreeing to home

18 confinement, in addition to surrendering the passport --

19          THE COURT:   Let me ask you a question.  In the

20 Pretrial Services report, Mr. Hernandez reports 600,000

21 in, an estimated net worth of $600,000, on page 2 of the

22 Pretrial Services report.  Where does the additional 150

23 come from?

24          MR. LAZZARO:   I'm going to tell you where,

25 Judge.  I have three bank statements from three separate

42

accounts.  I spoke to his accountant last night because I
knew that this would come up today.  And Daniel Hernandez
knows that he makes a lot of money.  I don't think he
realizes how much money he does make or he's made in the
last year.  In these three separate accounts are close to
$1.7 million.  I'd be willing, Judge, to go to $1 million.
He's not running from this court.  He's willing to stay
home.  He would not be a danger to anybody.  But the DA's
position that he's a danger to the community when they let
him walk out of the FBI agent, and nothing changed between
Saturday and Sunday other than --

       THE COURT:   Hold on a second.  Before we leave
the subject of money, if he has 1.7 million in the bank,
if 1 million is posted as bail, doesn't that still leave
him $700,000 --

       MR. LAZZARO:   Judge --

       THE COURT:    -- which would certainly finance a
trip?

       MR. LAZZARO:   Judge, I would put 1.5 million.
That's not an issue; he's not running.

       THE COURT:   All right, go ahead.

       MR. LAZZARO:   So the money is not an issue,
Judge, he's never run a day in his life.  He had a pending
case in Manhattan, he came back each and every time a

43

judge told him to.  So we would be willing --

THE COURT:  No, but I mean the penalties he faces here are far more severe than the penalties he faced on that case.

MR. LAZZARO:  I understand that argument, Judge, but the question is are there some set of bail factors that can take him and protect the public.  He'd be under home confinement with electronic monitoring.  He's put up a substantial sum of money with this Court.  He'd surrender his passport.  How the Government could argue that those sets of facts which is, they would've agreed to much less, Judge, on Saturday night.  I could've agreed to have him come home and they would've protected him.  This wouldn't have happened on Sunday.  The fact that there were threats to his life forced their hand, I understand that.  But he was such a danger to the community, they let him walk out on Saturday night with me, Judge.

He's got his mother in this courtroom.  He's got his brother in this courtroom.  There's no reason for him to go anywhere but stay here, Judge.  His whole life has been in Brooklyn, New York.  He's a lifelong resident. Under those circumstances, Judge, I don't think the U.S. Attorney can argue that he'd be a danger to the community when he'd be home the whole time.

                                                                44

          And, Judge, he fired everybody.  That's what the
prosecutor doesn't understand.  He removed himself from
the bad element, and he went public with that, Judge.  He
renounced everything with respect to two of the
codefendants.  He went public with that.  That's when the
threats came, Judge.

          MR. LONGYEAR:   Briefly, Your Honor, if I may.

          THE COURT:   Go ahead.  Well, let me ask you
first why would not a seven figure bail package with home
detention with electronic monitoring be sufficient?

          MR. LONGYEAR:   Your Honor, with respect to risk
of flight, Your Honor, I mean electronic monitoring is not
foolproof.

          THE COURT:   Well, the Bail Reform Act does not
require foolproof security.

          MR. LONGYEAR:   No, Your Honor --

          THE COURT:   It requires a combination or,
condition or combination of conditions reasonably
calculated to secure the defendant's presence in court.
Nothing is foolproof.

          MR. LONGYEAR:   Detention is, would ensure his
presence in court, Your Honor, and --

          THE COURT:   No, but that's not what the Bail
Reform Act requires.

                                                                45

2              MR. LONGYEAR:   I understand that, Your Honor,

3    but, again, the defendant is facing a significant term of

4    incarceration and has incentive to leave, Your Honor.

5    And, again, with respect to the events of this weekend,

6    going home with an armed escort of law enforcement for a

7    short period of time until we take the case down, this was

8    not an indefinite guarantee that Mr. Hernandez could stay

9    home with NYPD, ATF, and HSI providing round the clock

10   security.  But we had an obligation, because there was a

11   credit threat against him, to protect him.

12              Finally, Mr. Lazzaro makes a point that he has,

13   you know, disassociated himself with at least two of his

14   codefendants.  At no time and including in that Friday

15   interview the defendant did not renounce his member in

16   Nine Trey.  He promotes himself as a member of Nine Trey,

17   he's a member of the Bloods.  It's set forth in the

18   letter, as indicted by a grand jury earlier today, he's

19   participated in multiple acts of violence, brazen acts of

20   violence throughout the streets of New York City, Your

21   Honor.

22              THE COURT:   All right, well, the grand jury

23   makes a probable cause finding, not a finding of guilt or

24   innocence.

25              MR. LONGYEAR:   Yes, Your Honor.

```
 1                                                            46
 2            THE COURT:   And the probable cause finding is
 3   substantially below finding of guilt beyond a reasonable
 4   doubt.
 5            MR. LONGYEAR:   But I would submit, Your Honor,
 6   with the --
 7            THE COURT:   It's a one-sided presentation also.
 8            MR. LONGYEAR:   Yes, Your Honor, but with
 9   respect to the Government's evidence, just portions of
10   which, still images of which were presented to Your Honor
11   earlier today --
12            THE COURT:   No, but one of the things — I'm
13   sorry to interrupt you, but one of the things that I find
14   troubling here is that your dangerousness arguments are
15   predicated on conduct that took place, the most recent act
16   I guess was the July shooting.  So that's four months ago.
17   You got the gun recovery in September.  It sounds like
18   there is no additional evidence of danger to the community
19   from Mr. Hernandez, not danger directed toward him, but
20   danger from Mr. Hernandez, no evidence of additional
21   activity suggesting Mr. Hernandez's dangerousness post-
22   September.
23            There has not been a proffer that there was an
24   ongoing investigation, that there was something else that
25   the Government thought was imminent that justified keeping
```

47

the investigation going.  The conduct that gives rise to

the risk of dangerousness took place several months ago,

and the Government left Mr. Hernandez at large.  And now

the Government is contending that he's too dangerous to be

left at large even under conditions of home confinement

and a very substantial cash bail.  And that's what

troubles me.  Maybe you want to address that.

MR. LONGYEAR:   One moment, Your Honor.

THE COURT:   Or put another way – to put the

question another way, as of September the Government did

not believe he was so dangerous to the community that he

needed to be apprehended.  There are no additional facts

proffered post-September, but now two months later he's

too dangerous to leave on the streets according to the

Government.  And that's what troubles me a little bit.

Maybe you can address that.

(pause in proceeding)

MR. LONGYEAR:   Your Honor, as I stand here

today, I'm not aware of any other acts of violence.  I

will say the Government's investigation is still ongoing,

and, indeed, with the April 3 robbery, that robbery was

never reported.  There was no – Mr. Lazzaro said that

there was not NYPD – NYPD let him go or something to that

effect.  There was no record of that robbery.  We found it

48

1

2   in our investigation.  There was no police reports, there

3   were no 911 calls.  That was based on our investigation.

4           So I guess, Your Honor, it's unclear whether or

5   not there were, as I stand here today, I'm not aware of

6   any other acts of violence.  We were only up on a wiretap

7   for not even 20 days --

8           THE COURT:  When did you learn of the April

9   robbery?

10          MR. LONGYEAR:   I'm sorry, Your Honor?

11          THE COURT:  When did you learn of the alleged

12  April robbery?

13          MR. LONGYEAR:  We learned about it in about two

14  months ago, Your Honor.

15          THE COURT:  All right, go ahead.

16          MR. LONGYEAR:  So, Your Honor, it's the

17  Government's contention that the defendant is a member of

18  a violent set of the Bloods and that there are no set of

19  conditions here could ensure the safety of the community,

20  Your Honor.  I mean he is, again, he's participated in

21  multiple acts, he's directed some of those acts is the

22  Government's contention, and that this is a presumption

23  case.  He faces a significant term of incarceration.  And

24  for those reasons, Your Honor, the Government thinks that

25  detention is appropriate here.

1

2          MR. LAZZARO:   Judge, he renounced anything to

3   do with any, at least two of his codefendants that were

4   working for him.  He renounced them by firing them, he

5   renounced them publicly over a 50-minute interview, up to

6   an hour on the Breakfast Club, a station in New York City.

7   He renounced any type of involvement with these people.

8   There's been nothing, Judge, before this Court other than

9   the last allegedly what was recovered in his home when he

10  was in Europe.

11          However, Judge, again, for the Government to

12  make an argument that he's a danger to the community when

13  they let him walk out on Saturday night with me, there was

14  no discussion that he was a danger to the community.  The

15  only thing that changed between Saturday and Sunday,

16  Judge, is that they felt that they couldn't follow him any

17  longer and thought that this threat would follow him if he

18  went to Connecticut to Foxwood.  That's the only change

19  here, Judge.  It wasn't that he's a threat to the

20  community.  The threat was to him personally, Judge.

21          So what I'm proposing, Judge, is a substantial

22  bond where he would be off the streets.  There'd be no

23  risk of flight.  There's be an ankle bracelet on him 24

24  hours.  And it's substantial, Judge, what I proposed.  And

25  I would surrender his passport, Judge.

50

THE COURT:   What did you say the bank accounts totalled, 1.7 or 1.75?

MR. LAZZARO:   I think 1.7.  I have – hold on, Judge, I'll try and give you the most recent ones.  That one bank account, Judge, under 69 Entertainment, that the ending balance on October 31 was 260,000.  He's got another account, Judge, ending on October 31 in the name of 69 Touring where the ending balance was $469,999.  And then he's got another third account under Tekashi69 Publishing ending on October 31 where he's got 575,000.  SO those are in his three accounts, Judge, presently.  I'm going to try and give you the most recent statements, Your Honor.

THE COURT:   There's 260, 470, and 575?  Is there another bank account?

MR. LAZZARO:   Yeah, there is, Judge.

THE COURT:   All right.

MR. LAZZARO:   There is 469,999 --

THE COURT:   I think you gave me that one already.

MR. LAZZARO:   Okay, so he's got 470,000, 576,000, and he's got 261,000, Judge.

THE COURT:   All right.

MR. LAZZARO:   I'll pass it up to Your Honor.

1                                                                      51

2              THE COURT:   No, that's all right.

3              MR. LAZZARO:   He'd be willing to put the entire

4    bank account, the proceeds into deposit with the court.

5    He basically would have no ability to flee or anything

6    like that.

7              (pause in the proceeding)

8              THE COURT:   In some respects this is really, I

9    think in some respects a difficult case.  The two factors

10   that are critical to bail determination, the risk of non-

11   appearance and danger to the community, the Government has

12   a presumption here, and the defendant has to – for the

13   defendant to be granted bail, the defendant has to rebut

14   that presumption.

15             With respect to risk of flight, or the risk of

16   non-appearances perhaps more accurately, I think there

17   are, there would be bail conditions that could minimize

18   the risk of flight to an acceptable level.  The

19   substantial cash bail that Mr. Lazzaro has proposed along

20   with home detention enforced by electronic monitoring I

21   think would minimize the risk of non-appearance.

22             The risk of danger though is a more troubling

23   factor, and the dangerousness to the community is

24   something that's much less amenable to minimization

25   through bail conditions.  Here there are several

1

2  aggravating factors that corroborate or reinforce the

3  presumption the Government enjoys.  The fact that the

4  proceeds, the backpack and the identity documents that

5  were taken during the April 3 robbery were found in the

6  apartment that Mr. Hernandez was in the process of

7  vacating I think is compelling evidence corroborating his

8  involvement in that robbery.

9          I understand Mr. Lazzaro's proffer that he was

10  not physically in the lobby when the robbery took place.

11  The Government has proffered that he was outside in the

12  car videoing the lobby, videoing the robbery in the lobby.

13  But the fact that the proceeds were found in the apartment

14  or maybe part of the proceeds were found in the apartment

15  I think corroborates the Government's theory of his

16  involvement.

17          The recovery of the firearm, the AR-15 from the

18  apartment is also very troubling.  It doesn't appear that

19  the apartment had been abandoned as of the date that the

20  Government recovered the firearm.  It appears that the

21  defendant and his family were in the process of moving but

22  had not quit the premises.

23          (pause in proceeding)

24          THE COURT:   The unfortunate reality is that

25  even if someone is subject to home detention with

electronic monitoring, they are still capable of directing

acts of violence and participating in acts of violence.

Given the ubiquitousness of cell telephones, even

monitoring of a landline, monitoring of telephone calls

would not, adding that as a bail condition I don't think

could eliminate Mr. Hernandez's potential involvement in

acts of violence.

The Government does have a presumption here.  I

think the risk of non-appearance could be minimized by

bail conditions, but I don't believe that the risk of

danger to the community could be minimized by bail

conditions.  I don't think the presumption with respect to

dangerousness has been rebutted, although I take your

point, Mr. Lazzaro, and it is a close case, but in my

determination I don't think the risk of dangerousness has

been rebutted.  And for that reason I'm going to direct

that Mr. Hernandez be detained pending trial.

If you want, we can ask the Marshals to produce

him in the cellblock tomorrow if you want to take an

appeal to Judge Engelmayer or I presume Judge Engelmayer's

available tomorrow.

MR. LONGYEAR:  Unclear, Your Honor.  I know he

has a schedule, so it would be Judge Engelmayer or Part 1.

THE COURT:  Or the Part 1 judge.  But if you

1                                                                54

2    want to do that, Mr. Lazzaro, that can be done.

3              MR. LAZZARO:   I would like to do that, Judge.

4              THE COURT:   All right, can the Marshals have

5    him in the cellblock tomorrow so they can take an appeal

6    to the district court?  All right, I take it there is a

7    conference before Judge Engelmayer in any event next

8    Monday the 26th at 10:30.

9              MR. LONGYEAR:   Correct, Your Honor.

10             THE COURT:   All right.  Anything else from the

11   Government?

12             MR. LONGYEAR:   No, Your Honor.

13             THE COURT:   Mr. Lazzaro, anything else?

14             MR. LAZZARO:   That's it, Your Honor.

15             THE COURT:   Okay, thank you all.  We're back on

16   the record.  Okay, go ahead.

17             MR. LAZZARO:   Can you order medical treatment,

18   Judge?  He suffers from asthma.

19             THE COURT:   Okay.

20             (Whereupon the matter is adjourned.)

21

22

23

24

25

55

# C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the United States District
Court, Southern District of New York, United States of
American v. Hernandez, docket number 18cr834, was prepared
using digital electronic transcription equipment and is a
true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

Date:  November 22, 2018