Ibqdjonc
                          Arraignments

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                 New York, N.Y.

4              v.                             S1 18 Cr. 0834(PAE)

5   JAMEL JONES, a/k/a "Mel
    Murda," KIFANO JORDAN, a/k/a
6   "Shotti," JENSEL BUTLER, a/k/a
    "Ish," DANIEL HERNANDEZ, a/k/a
7   "Tekashi 6ix 9ine," FUGUAN
    LOVICK, a/k/a "Fu Banga," and
8   FAHEEM WALTER, a/k/a "Crippy,"

9              Defendants.

10  ------------------------------x

11
                                             November 26, 2018
12                                           10:51 a.m.

13
    Before:
14
                    HON. PAUL A. ENGELMAYER,
15
                                             District Judge
16

17                      APPEARANCES

18  GEOFFREY S. BERMAN
         United States Attorney for the
19       Southern District of New York
    BY:  MICHAEL D. LONGYEAR
20       JACOB E. WARREN
              Assistant United States Attorneys
21
    CARDI & EDGAR LLP
22       Attorneys for Defendant Jamel Jones
    BY:  DIANE FERRONE
23
    LAW OFFICES OF SCOTT E. LEEMON, PC
24       Attorneys  for Defendant Kifano Jordan
    BY:  SCOTT E. LEEMON
25

Ibqdjonc
Arraignments

1                       APPEARANCES CONTINUED

2   THE LAW OFFICES OF SEAN M. MAHER, PLLC
         Attorneys for Defendant Jensel Butler
3   BY:  SEAN M. MAHER

4   DAWN M. FLORIO LAW FIRM PLLC
         Attorneys for Defendant Daniel Hernandez
5   BY:  DAWN MARIA FLORIO
              - and -
6   LAZZARO LAW FIRM, P.C.
    BY:  LANCE LAZZARO

7
    EDWARD VINCENT SAPONE
8        Attorneys for Defendant Faheem Walter

9                            oOo

10          (Defendants Fuguan Lovick and Faheem Walter not

11   present)

12          THE CLERK:  United States versus Jones, et al., S1 18

13   Criminal 834.

14          Attorneys for the government, state your appearances.

15          MR. LONGYEAR:  Good morning, your Honor.  Michael

16   Longyear and Jacob Warren on behalf of the United States.

17          THE COURT:  OK.  One moment.

18          (Pause)

19          All right.  Good morning, Mr. Longyear, and good

20   morning, Mr. Warren.

21          THE CLERK:  For defendant Jones.

22          MS. FERRONE:  Diane Ferrone, of counsel to Cardi &

23   Edgar, for Mr. Jones.

24          THE COURT:  All right.  Good morning, Ms. Ferrone.

25          And which is Mr. Jones?  Can you raise your hand,

Ibqdjonc
                         Arraignments

1   please?

2              (Defendant Jones indicating)

3              THE COURT:  All right.  Good morning, Mr. Jones.

4              THE CLERK:  For defendant Jordan.

5              MR. LEEMON:  Good morning, your Honor.  Scott Leemon

6   L-e-e-m-o-n, on behalf of Mr. Jordan, who is in the jury box

7   right there.

8              THE COURT:  All right.  Good morning, Mr. Jordan.

9              THE CLERK:  For Mr. Butler.

10             MR. MAHER:  Good morning, your Honor.  Sean Maher for

11  Mr. Butler, who is the person on the left in the first row.

12             THE COURT:  Very good.  All right.  Good morning,

13  Mr. Maher, and good morning, Mr. Butler.

14             THE CLERK:  For Mr. Hernandez.

15             MR. LAZZARO:  Lance Lazzaro and Dawn Florio for

16  Mr. Hernandez.  Your Honor, he is in the back row, the third

17  row.

18             MS. FLORIO:  Good morning, your Honor.

19             THE COURT:  All right.  Very good.  Good morning,

20  Mr. Lazzaro.

21             I'm sorry.  Who are you with, Mr. Lazzaro?

22             MS. FLORIO:  Dawn Florio.

23             THE COURT:  All right.  Good morning, Ms. Florio, and

24  good morning to you, Mr. Hernandez.

25             THE CLERK:  For defendant Walter.

Ibqdjonc
                              Arraignments

1          MR. SAPONE:  Yes.  Good morning, your Honor.  Edward

2   Sapone for Mr. Walter, who is reportedly in the hospital, your

3   Honor.

4          THE COURT:  What is his condition?

5          MR. SAPONE:  I don't know.  The marshals inform me

6   that he was taken from the MDC Brooklyn to the hospital, and so

7   he obviously couldn't be here in court.

8          THE COURT:  All right.  I take it you waive his

9   appearance?

10         MR. SAPONE:  Yes, your Honor.

11         THE COURT:  All right.  Thank you.  Good morning to

12  you.

13         MR. SAPONE:  You are welcome.

14         THE COURT:  All right.  You may all be seated.

15         Government, I see that there is a sixth defendant on

16  the Indictment of Mr. Lovick.  What is the status of

17  Mr. Lovick?

18         MR. LONGYEAR:  Yes, your Honor.  Mr. Lovick is in

19  state custody.  A writ was lodged last week, on Wednesday, and

20  we anticipate having Mr. Lovick transferred tomorrow.

21         THE COURT:  As soon as he is transferred, please let

22  Mr. Smallman know and I will need to have a conference to

23  arraign him and to sync him up on the same schedule as set with

24  everybody else.

25         MR. LONGYEAR:  Yes, your Honor.

Ibqdjonc
Arraignments

1    THE COURT:  All right.  First of all, good morning as

2 well to everyone else who is here, who I take it to be members

3 of the public, family members, and so forth.

4    Here is the sequence that I would like to follow here.

5 To begin with, there are some dates that I need to obtain from

6 the government involving the date of indictment and the date of

7 presentment and so forth.

8    I understand, as well, Mr. Longyear, that none of the

9 defendants have been arraigned, is that correct?

10    MR. LONGYEAR:  That is correct, your Honor.

11    THE COURT:  Then I will need at that point to arraign

12 all of the defendant which oughtn't take long.  At that point,

13 I will turn the floor to the government for a detailed

14 description of the crimes alleged, both in terms of what the

15 formal crimes are but as well as I am eager to get a better

16 understanding of what the conduct that is underlying the

17 Indictment is alleged to be.

18    Following that and after some likely colloquy about

19 that, I will want a detailed description of the Rule 16

20 material in the case, the required discovery, and a prompt

21 timetable under which the government intends to produce it.  As

22 part of that same colloquy, I am going to be asking you about

23 Fourth and Fifth Amendment Sixth Amendment events, the sort of

24 items that tend to be the subject of potential suppression

25 motions.

Ibqdjonc

Arraignments

1        It is my practice at a second conference in a case to

2  require the defense, if it is going to be moving to suppress

3  something, to give notice of that by then so I could set a

4  prompt suppression schedule.  What makes that work is if the

5  government spells out all of the relevant events at the first

6  conference so that the defense has prompt notice of the

7  searches, seizures, post-arrest statements, that sort of thing

8  that occurred.

9        I will then be eager to take up issues involving the

10  broader case schedule, whether the government anticipates a

11  superseding indictment, the potential schedule for that.  I

12  will also want to set a next conference date in the case.  I

13  envision, in all likelihood, sometime in January, but I will be

14  eager to hear counsel's views on that, and to set a trial date

15  so we all have something to preserve on our calendars.

16        After all of that, I will open the floor to the extent

17  that counsel have issues that they want to raise.  But one

18  thing to note is this:  If there are individual specific

19  issues, bail appeals, counsel representation issues -- those

20  are not properly raised in this group conference.  I will be

21  happy to takes a roster of what those issues are.  Mr. Smallman

22  and I will then work with you to set an individual conference.

23  To date, I have not been given notice of any individual bail

24  appeal but there may be such a thing.  If there is to be one, I

25  will want to schedule it giving me ample time to review the

Ibqdjonc
Arraignments

1   transcript of whatever proceedings as to bail occurred before

2   the magistrate judge and the Pretrial Services report as to the

3   defendant in question.

4            All right.  With that, thought, when was the

5   Indictment returned?

6            MR. LONGYEAR:  Yes, your Honor.  The Indictment was

7   returned on Monday, November 19th.

8            THE COURT:  OK.  And when were the defendants arrested

9   on the Indictment?

10           MR. LONGYEAR:  Your Honor, Defendant Jones was

11  arrested on November 19th at approximately 2:10 p.m.  Defendant

12  Butler was arrested on November 19th at approximately 1 a.m.

13  Defendant Jordan was arrested on November 18th at approximately

14  9:30 p.m.  Defendant Hernandez was arrested on November 18th at

15  approximately 7 p.m.  And, your Honor, Defendant Walter was

16  arrested on November 19th at approximately 12:05 a.m.

17           THE COURT:  Several of the defendants were arrested

18  before the Indictment was returned?

19           MR. LONGYEAR:  That is correct, your Honor.  They were

20  arrest on probable cause, and we went to the Grand Jury on

21  Monday morning.

22           THE COURT:  So the Grand Jury returned an indictment

23  within 24 hours of the arrest?

24           MR. LONGYEAR:  That is correct, your Honor.

25           THE COURT:  All right.  And when were the defendants

Ibqdjonc
Arraignments

1    presented?

2              MR. LONGYEAR:  They were all presented on Monday,

3    November 19th, in the evening before Magistrate Judge Pitman.

4              Your Honor, I would also note that another defendant,

5    Roland Martin, was arrested on Thursday morning on another

6    Superseding Indictment that was also returned on Monday, the

7    19th.  He is in transit from MDC.  He was lodged there over the

8    weekend.  He waived presentment on Saturday.  And we anticipate

9    his arrival today for presentment later this afternoon in

10   magistrate court.

11             THE COURT:  All right.  That is fine.  Once he has

12   been presented in magistrate's court, please contact

13   Mr. Smallman.  We will arrange a proceeding for him.  Obviously

14   going forward, I'm hoping that we'll have everyone sync up to

15   the same schedule and have a common conference but I certainly

16   understand what happened here.

17             MR. LONGYEAR:  Yes.

18             THE COURT:  All right.  Let me then turn to the matter

19   of arraignment of the defendants.  I want to take this as much

20   as I can globally.

21             Mr. Smallman -- and counsel, I'm going to just confirm

22   with all of you that you have had a chance to review the

23   Indictment with your clients?

24             ALL DEFENSE COUNSEL:  Yes.

25             THE COURT:  OK.  And are all of you confident that

Ibqdjonc
                          Arraignments

1    your clients are of clear mind such that they can enter what I

2    expect will be a plea of not guilty today?

3              ALL DEFENSE COUNSEL:  Yes, your Honor.

4              THE COURT:  Very good.  Mr. Smallman, if you would

5    kindly ask the defendants to rise and swear them.

6              THE CLERK:  OK.

7              Please rise.

8              (The defendants were sworn)

9              THE COURT:  All right.  Gentlemen, you may be seated.

10   I am going to ask you just a series of brief questions.

11             Have each of you -- just answer yes or no.  Have each

12   of you seen a copy of the Indictment?

13             ALL DEFENDANTS:  Yes, your Honor.

14             THE COURT:  OK.  Have you had an opportunity to

15   discuss it with your lawyer?

16             ALL DEFENDANTS:  Yes.

17             THE COURT:  All right.  Do you waive its public

18   reading?

19             ALL DEFENDANTS:  Yes.

20             THE COURT:  All right.  And how do you plead?

21             ALL DEFENDANTS:  Not guilty.

22             THE COURT:  OK.  Very good.

23             Government, any further questions that I ought to be

24   putting to the defendants by way of arraignment?

25             MR. LONGYEAR:  No, your Honor.

Ibqdjonc

Arraignments

1    ALL DEFENSE COUNSEL:  No, your Honor.

2    THE COURT:  All right.  Having taken care of

3 arraignment, then, let's turn now to a description of the case.

4    Mr. Longyear, will you be speaking?

5    MR. LONGYEAR:  Yes, your Honor.

6    THE COURT:  All right.  Tell me about the charges and

7 conduct alleged in the case.

8    MR. LONGYEAR:  Yes.  Thank you, your Honor.

9    Your Honor, the investigation began in or about

10 February 2018 into the Nine Trey Gangsta Bloods, which is a

11 sect of the Unite Bloods Nation.  The nature of the

12 investigation was social media, phones and the like, but -- so

13 Count One charges a RICO conspiracy emanating from this sect of

14 the Bloods.

15    THE COURT:  But the racketeering organization is the

16 subset, the Nine Trey Gangsta Bloods subset, not the overall

17 Bloods?

18    MR. LONGYEAR:  That is correct, your Honor.

19    In the course of the government's investigation, your

20 Honor, there are several acts of violence, some of which are

21 set forth in the Indictment.

22    Going in order, beginning on April 3, 2018, there was

23 an armed robbery that took place in Midtown Manhattan near

24 Times Square.  Certain of the defendants participated in that

25 robbery.  It was a gunpoint robbery of a rival gang member.

Ibqdjonc
Arraignments

1        THE COURT:  What happened?

2        MR. LONGYEAR:  Several of the defendants, they waited

3   outside of the building.  As the victims were leaving the

4   building, several of the defendants rushed in and held the

5   victims at gunpoint and stole certain property from them --

6   jewelry, bags, and the like.  That robbery was captured on

7   surveillance video.  As the government detailed at the

8   presentment for Mr. Hernandez, it the government's contention

9   that Mr. Hernandez was in the back seat of the car as it was

10  parked outside and filmed the robbery.

11       Moving to April 21st, your Honor, there were two acts

12  of violence that occurred that day.  The first was in the

13  middle of the afternoon.  Mr. Hernandez and Mr. Jordan and

14  others were in Brooklyn.  They got into a verbal altercation

15  with other people.  That altercation resulted in Mr. Jordan,

16  Mr. Hernandez and others driving away from the scene and being

17  followed by the victims.

18       At a one-way stop, the car that Mr. Hernandez and

19  Mr. Jordan were traveling in was blocked by a garbage truck.

20  Mr. Jordan and Mr. Hernandez exited the vehicle.  Mr. Jordan

21  approached the victim vehicle and fired two shots at the victim

22  vehicle.

23       THE COURT:  Did the shots hit anything?

24       MR. LONGYEAR:  Just the car.  No one was struck, your

25  Honor.

Ibqdjonc
                          Arraignments

1            Later that evening, at the Barclays Center in

2    Brooklyn, Mr. Hernandez and several of the other defendant were

3    present.  Mr. Hernandez was scheduled to sing the entrance song

4    for -- there was a boxing match scheduled for that night.  He

5    was scheduled to sing for one of the boxers.  There was a rival

6    rapper and gang member who was scheduled to sing for the other

7    boxer.  The two groups met --

8            THE COURT:  Gang rivals were singing for separate

9    boxers?

10           MR. LONGYEAR:  Correct.  Correct, your Honor.

11           The two groups met in a hallway at the Barclays

12   Center.  An altercation ensued.  And one of the defendants,

13   Mr. Lovick, discharged a round inside the Barclays Center.

14           The next act of violence that is detailed --

15           THE COURT:  After the exchange of gunfire or the

16   firing by Mr. Lovick, did events go on at the Barclays Center

17   as planned?

18           MR. LONGYEAR:  No.  The defendants exited, were told

19   to leave the Barclays Center.  They exited the Barclays Center,

20   your Honor.

21           THE COURT:  Who sang the intro song?

22           MR. LONGYEAR:  I don't have that information handy,

23   your Honor.

24           THE COURT:  OK.  Go ahead.

25           Were any arrests made after -- I mean, in a public

Ibqdjonc
                              Arraignments

1   place you are saying there was a shooting.

2              MR. LONGYEAR:  Yes.

3              THE COURT:  Were there arrests made that night?

4              MR. LONGYEAR:  Mr. Lovick was arrested.  That's why he

5   was held in state --

6              THE COURT:  So he is in custody --

7              MR. LONGYEAR:  On the shooting.

8              THE COURT:  -- on what you are contending was a

9   predicate act?

10             MR. LONGYEAR:  Correct, your Honor.

11             Moving on, your Honor, the next act of violence as

12  detailed in the Indictment occurred in January, January 16,

13  2018 -- sorry, July 16, 2018.  Excuse me.  There was a barbecue

14  in a public housing building in Brooklyn.  The intended victim,

15  who a member of Nine Trey but had a falling out with other

16  members within Nine Trey, was going live on Instagram.  He was

17  on Instagram Live.  Certain of the defendants saw this,

18  including Mr. Jordan and Mr. Hernandez.  And it's the

19  government's contention that Mr. Jordan and Mr. Hernandez

20  directed that violence -- that basically that the victim be

21  shot and that other defendants, your Honor, shot at the victim.

22  A shootout ensued at that public housing project, and a woman,

23  a victim, was struck in the foot.

24             THE COURT:  When you say the victim was going live on

25  Instagram, on subjects relating to the gang?

Ibqdjonc

Arraignments

1         MR. LONGYEAR:  I think more generally just going live

2  to show the location so that they knew where to go.

3         So, your Honor, those are the acts that are detailed

4  in the Indictment.  There are other acts that the government is

5  still investigating.

6         As per your Honor's questions earlier this morning,

7  the nature in which this was taken down was there was a bit of

8  a rush given certain security concerns that occurred the

9  weekend prior to the Indictment, which is why certain of the

10  arrests were probable cause arrests followed by an indictment

11  on Monday.

12         THE COURT:  The Indictment refers to murder.  What can

13  you say about that?

14         MR. LONGYEAR:  I think it is acts involving murder,

15  your Honor.  So, the attempted murder is the shootings.

16         THE COURT:  Were there actual murders?

17         MR. LONGYEAR:  Not -- the government has no knowledge

18  of an actual murder at this point, your Honor.

19         THE COURT:  So the use of the word "murder" in the

20  Indictment is as an object?

21         MR. LONGYEAR:  Correct.

22         THE COURT:  Not a completed object of the conspiracy?

23         MR. LONGYEAR:  Correct.

24         THE COURT:  All right.  But as you stand here now, you

25  are unaware of this gang actually accomplishing a murder?

Ibqdjonc
                          Arraignments

1            MR. LONGYEAR:  That is correct, your Honor.

2            THE COURT:  All right.  OK.  Tell me about the Rule 16

3       evidence.

4            MR. LONGYEAR:  Yes, your Honor.  The Rule 16 evidence

5       is quite extensive.  We have several social media search

6       warrants that were executed on various accounts for Instagram

7       and Snapchat.  We have other electronic --

8            THE COURT:  I'm sorry.  Are you able to -- because I

9       ultimately want to make sure that defense counsel are aware of

10      all the searches in the case, slow it down and tell me, if you

11      can, whose social media accounts were searched so that the

12      relevant defendant is on notice.

13           MR. LONGYEAR:  Yes, your Honor.

14           With respect to the charged defendants, Mr. Hernandez

15      and Mr. Walter for Instagram and Mr. Walter for Snapchat.

16           THE COURT:  I take it there are other searches of

17      other people's social media accounts but none for any of the

18      charged defendants?

19           MR. LONGYEAR:  That is correct, your Honor.

20           With respect to other electronic evidence, the

21      government obtained search warrants for iCloud accounts, the

22      ICloud accounts belonging to Mr. Hernandez, Mr. Jordan,

23      Mr. Butler, Mr. Walter, and others.

24           THE COURT:  What time period do those cover?

25           MR. LONGYEAR:  The search was asked for approximately

Ibqdjonc
                              Arraignments

1   March 2018.

2            THE COURT:  So approximately a one-month period?

3            MR. LONGYEAR:  March 2018, it is about a six-month

4   period.  So the warrants were obtained in and around I believe

5   August or September of 2018.

6            THE COURT:  All right.  So they cover March through

7   about August or September?

8            MR. LONGYEAR:  That is correct, your Honor.

9            THE COURT:  I should have asked as to the social

10  media, just to get a better sense of volume, what is the time

11  span covered by those search warrants?

12           MR. LONGYEAR:  Your Honor, the search warrants sought

13  the same time period.

14           I will note with respect to one of the returns, the

15  return belonging to Mr. Hernandez, it is quite voluminous.  In

16  fact, we have actually not had an opportunity yet to fully

17  reviewer the return.

18           THE COURT:  This is the return on the social media

19  search warrant?

20           MR. LONGYEAR:  On the Instagram account, yes, your

21  Honor.  Because it is so large, we are having difficulty

22  loading it onto a platform to actually review the return.

23           THE COURT:  Do you have a sense at this early point

24  what share of the social media returns are potentially germane

25  to this case as opposed to extraneous matters?

Ibqdjonc

Arraignments

1      MR. LONGYEAR:  I don't, your Honor, and, again, for

2  the reasons -- Mr. Hernandez's return we actually haven't been

3  able to search, and with Mr. Walter's Instagram and Snapchat,

4  we haven't received the actual return yet.  We should be

5  getting that hopefully in the next several days.

6      THE COURT:  All right.  So you've given me categories

7  of social media search warrants and iCloud accounts.  Go ahead.

8      MR. LONGYEAR:  We obtained email search warrants for

9  Mr. Jordan and Mr. Hernandez and others.  Again, the same time

10  period.

11      THE COURT:  That six-month period?

12      MR. LONGYEAR:  Yes, your Honor.

13      THE COURT:  Go ahead.

14      MR. LONGYEAR:  There are phone returns for

15  Mr. Hernandez, Mr. Walter and Mr. Jordan.  With Mr. Walter we

16  were able only to get into the -- we were able to access the

17  phone itself --

18      THE COURT:  Sorry.  Phone returns?

19      MR. LONGYEAR:  Sorry.  Search warrants on cell phones.

20  So phone --

21      THE COURT:  How did you get the cell phones?

22      MR. LONGYEAR:  So with Mr. Hernandez, the one phone we

23  have was at a border crossing.

24      THE COURT:  Unpack that for me, please.

25      MR. LONGYEAR:  He was traveling overseas.  He came

Ibqdjonc
Arraignments

1   back in and his phone was searched at the border.

2           THE COURT:  Pursuant to what?

3           MR. LONGYEAR:  Pursuant to the border exception, your

4   Honor.

5           THE COURT:  OK.  So you're saying -- when was that?

6           MR. LONGYEAR:  I believe it was around March 2018.

7           THE COURT:  So in March 2018, Mr. Hernandez's phone is

8   seized when he crosses the border.

9           MR. LONGYEAR:  Yes.

10          THE COURT:  Is it retained?  Is it imaged?  By what

11  means does law enforcement now have a copy of it?

12          MR. LONGYEAR:  It was imaged, your Honor.

13          THE COURT:  OK.  So the Hernandez cellphone is

14  searched not pursuant to a criminal investigation but pursuant

15  to his crossing the border?

16          MR. LONGYEAR:  That is correct, your Honor.

17          THE COURT:  Go ahead.  What about the other phones?

18          MR. LONGYEAR:  With respect to Mr. Walter, we obtained

19  the phone on October 26th.  We got a search warrant early the

20  following morning.

21          THE COURT:  How did you get the phone on October 26th?

22          MR. LONGYEAR:  So to go back, on October 26th,

23  Mr. Hernandez had a state court appearance for his state

24  conviction.  It was a sentencing appearance.  He received

25  probation on that day.  A couple of hours later, he, Mr. Jordan

Ibqdjonc
Arraignments

1   and Mr. Walter went to a restaurant on the Upper East Side to

2   meet with a music manager, Mr. Hernandez's music managers.  An

3   altercation ensued between the music manager security and

4   Mr. Hernandez, Mr. Jordan and Mr. Walter.  Mr. Hernandez left

5   the scene.  Mr. Jordan and Mr. Walter returned.  A fight broke

6   out, and as a result one of the music manager's security

7   guards, who was a retired NYPD officer, discharged two rounds,

8   one of which hit Mr. Walter.  So his phone was recovered from

9   the scene of that incident.

10          THE COURT:  By whom?

11          MR. LONGYEAR:  By NYPD, your Honor.

12          THE COURT:  In other words, it's a crime scene and

13   NYPD finds the phone?

14          MR. LONGYEAR:  Correct, your Honor.  We then obtained

15   a search warrant to search that phone.  It was a new iPhone,

16   your Honor.  We were only able to get into basically access the

17   phone itself, but we were unable at this point to image the

18   phone.  So what agents did is they were able to just scroll

19   through the phone and they videotaped that as they were going

20   through whatever was on the phone, so we have the videotape of

21   that search.

22          THE COURT:  All right.  So the phones you've got so

23   far are Hernandez in March of 2018, Walter around October 26,

24   2018.  Are there other cell phones you have?

25          MR. LONGYEAR:  Yes, your Honor.  We obtained two

Ibqdjonc
Arraignments

1  phones, I believe, belonging to Mr. Jordan.  Those were

2  obtained pursuant to an arrest in New Jersey in May.  They were

3  logged as arrest evidence.  We obtained search warrants for

4  those phones to image them.  To date, we have not been able to

5  actually image those phones.

6         THE COURT:  In other words, they were seized incident

7  to arrest under a <u>Riley</u> search pursuant to a warrant, but the

8  search has been unsuccessful as a practical matter so far?

9         MR. LONGYEAR:  Correct, your Honor.

10         THE COURT:  OK.  Any other cell phones?

11         MR. LONGYEAR:  Those are the phones that we have now,

12  although I would note that pursuant to the arrest in this case,

13  the government obtained three phones from Mr. Hernandez, one

14  from Mr. Jordan, one from Mr. Jones, and one from Mr. Martin as

15  I indicated it will be presented later today, and we intend to

16  seek search warrants for those phones.

17         THE COURT:  So right now you've got six phones seized

18  incident to arrest in this case as to which you intend to but

19  haven't gotten yet search warrants?

20         MR. LONGYEAR:  That is correct, your Honor.

21         THE COURT:  All right.  OK.  Are we done with cell

22  phones now?

23         MR. LONGYEAR:  Yes, your Honor.

24         THE COURT:  All right.  So we've done social media,

25  iCloud, emails and phones.  Keep on going with Rule 16.

Ibqdjonc
                          Arraignments

1          MR. LONGYEAR:  Yes, your Honor.

2          During the course of this investigation, we got

3    several phone record and location warrants -- so cell site,

4    GPS, pen registers and call detail records, toll records -- I

5    believe for all the defendant at one point or another.  There

6    are numerous, numerous warrants for those, your Honor.

7          THE COURT:  Do you have A sense of the volume?

8          MR. LONGYEAR:  Probably approximately 20.

9          THE COURT:  20?

10         MR. LONGYEAR:  20 phones, your Honor, not 20 warrants.

11   Some of the warrants were for multiple phones --

12         THE COURT:  Right.  I guess I'm trying to get a sense

13   of the volume of the paperwork that you are describing now in

14   this category.

15         MR. LONGYEAR:  I think one of the warrants was I

16   believe for 18 phones.  So it is one warrant per historical

17   cell site for multiple phones of the defendants and others.

18         THE COURT:  There is a defendant who has 18 phones?

19         MR. LONGYEAR:  No, no, no, no, no.  The warrant itself

20   was for 18 phones, some of those phones belonging to charged

21   defendants and to others.

22         THE COURT:  I see.  But the bottom line is that the

23   documents that come when you have a cell site record for 18

24   phones are, by definition, formidable?

25         MR. LONGYEAR:  Yes.

Ibqdjonc
                        Arraignments

1              THE COURT:  OK.  Go ahead.

2              MR. MAHER:  Your Honor, I'm sorry to interject.  Sean

3    Maher fo Mr. Butler.

4              Could we get a little more clarity on the timeframe

5    for that search.

6              THE COURT:  Yes.  I think that is a valid question.

7              MR. LONGYEAR:  So, your Honor, many of these warrants

8    were tied to the acts of violence that have been charged in

9    this Indictment.  So, seeking location information pertaining

10   to acts in April or July of 2018.  So the historical cell site

11   is more of a limited range.  I don't believe there is anything

12   with respect to these defendants that predates the acts of

13   violence here.

14             THE COURT:  Meaning it starts on or about April of

15   2018?

16             MR. LONGYEAR:  Correct.  The large warrant itself was

17   obtained I believe in August, August or September.

18             THE COURT:  OK.

19             MR. LONGYEAR:  Of this year.

20             THE COURT:  All right.  Thank you.

21             Go ahead.  Next category of Rule 16 evidence.

22             MR. LONGYEAR:  Your Honor, the government obtained a

23   Title III intercept of one of Mr. Jones' phones.  That warrant

24   was authorized on October 31st.  It went --

25             THE COURT:  October 31st?

Ibqdjonc
Arraignments

1    MR. LONGYEAR:  It went up on October 31st.  Sorry.  It

2    was authorized on October 31st.  We went up on November 1st.

3    And it was taken down the day it was sealed, the day following

4    his arrest, which was on November 19th.

5              THE COURT:  So it was up for 19 or 20 days?

6              MR. LONGYEAR:  That is correct, your Honor?

7              THE COURT:  OK.  And how voluminous are the intercepts

8    during that 20-day period?

9              MR. LONGYEAR:  It is not too voluminous.  I haven't

10   reviewed the exact number of intercepted calls but it is not --

11   nothing crazy.

12             THE COURT:  All right.  Go ahead.

13             MR. LONGYEAR:  We have other audio recordings of

14   certain of the defendants, your Honor.  These are consensual

15   audio recordings.

16             THE COURT:  Can you elaborate?

17             MR. LONGYEAR:  Consensual audio recordings from a

18   confidential informant, your Honor.

19             THE COURT:  How voluminous are those in that category

20   of evidence?

21             MR. LONGYEAR:  Some of the recordings are long.  The

22   number of recordings aren't.  There aren't too many actual

23   recordings, but some of them are, you know, on the order of 30

24   minutes to an hour long.

25             THE COURT:  Time period?

Ibqdjonc
Arraignments

1         MR. LONGYEAR:  This is around summer of this year,

2    your Honor.

3         THE COURT:  OK.  Go ahead.

4         MR. LONGYEAR:  The next category, your Honor, are

5    prison calls, in particular prison calls relating to defendant

6    Lovick, who had certain calls with other of the charged

7    defendants.  These are from the state prison system that were

8    recorded.

9         THE COURT:  How voluminous are those?

10        MR. LONGYEAR:  Those are more voluminous, your Honor.

11   There are a number of phone calls, you know.  The maximum

12   duration of a recording is 15 minutes.

13        THE COURT:  Are these calls with, among others,

14   codefendants?

15        MR. LONGYEAR:  That is correct, your Honor.

16        THE COURT:  OK.  Go ahead.

17        May I ask you if you can say what the thrust is of the

18   prison calls, how that relates to the charged offenses?

19        MR. LONGYEAR:  There is discussion about some of the

20   charged acts of violence, your Honor, as well as Nine

21   Trey-related matters, gang-related matters, in terms of

22   leadership positions and rank and membership.

23        The next category, your Honor, are police reports,

24   NYPD reports, which include obviously the DD-5s of all the

25   various acts of violence that have been charged in the

Ibqdjonc
Arraignments

1  indictment, lab reports, including ballistics -- I believe

2  we're also waiting on DNA results -- and vouchers of vouchered

3  physical evidence.

4         THE COURT:  About how many different incidents are

5  covered by the NYPD reports?

6         MR. LONGYEAR:  Approximately about six or so, your

7  Honor.

8         THE COURT:  OK.  Thank you.

9         MR. LONGYEAR:  There is also physical evidence.  A

10  search warrant was executed on Mr. Hernandez's home on

11  September 27/28.

12         THE COURT:  I'm sorry.  There is a search warrant on

13  Mr. Hernandez's home late this September?

14         MR. LONGYEAR:  Late this September.  A firearm was

15  recovered as well as proceeds of the April 3rd robbery.

16         THE COURT:  What proceeds?

17         MR. LONGYEAR:  It was a bag of one of the victim's.

18  Some of his personal -- the victim's personal belongings were

19  also in that bag.  The "personal belongings" meaning passport,

20  credit cards, identification information.

21         There is surveillance video, your Honor, of several of

22  these incidents, including --

23         THE COURT:  I'm sorry.  On the search warrant, the

24  search warrant was approved by a magistrate judge here?

25         MR. LONGYEAR:  In Eastern District, in the Eastern

Ibqdjonc
                        Arraignments

1 | District.

2 |             THE COURT:  OK.  Thank you.

3 |             Go ahead.  I think you were in the middle of physical

4 | evidence.

5 |             MR. LONGYEAR:  That physical evidence, we executed a

6 | search warrant of a car belonging to Mr. Martin.  A gun was

7 | recovered from that -- I should say, the gun was recovered as

8 | the car was being repossessed.  The repo company brought it to

9 | NYPD.  We then subsequently obtained a search warrant for that

10 | car.  But the phone was recovered prior to the search warrant

11 | being executed -- sorry, prior to the search warrant being

12 | obtained.

13 |             THE COURT:  A search warrant was obtained in the

14 | Eastern or Southern District?

15 |             MR. LONGYEAR:  That was obtained in Southern, your

16 | Honor.

17 |             THE COURT:  When was it carried out?

18 |             MR. LONGYEAR:  Approximately a month ago.

19 |             THE COURT:  All right.  And the fruits of the search

20 | of the car?

21 |             MR. LONGYEAR:  There was nothing else.  The gun was

22 | the only thing that was recovered from the car.

23 |             THE COURT:  OK.  Thank you.

24 |             MR. LONGYEAR:  Turning to the next category, your

25 | Honor, would be surveillance video.  And this kind of dovetails

Ibqdjonc

Arraignments

1   with the NYPD DD-5, their reference, but it is surveillance

2   video of the April 3 robbery, the two incidents on the 21st,

3   the incident in July, July 16, 2018.

4           And finally, your Honor, financial records.  We

5   obtained certain subpoenas for financial records belonging to

6   Mr. Hernandez and Mr. Jordan.

7           THE COURT:  How voluminous are they?

8           MR. LONGYEAR:  Not too voluminous.  I think we only

9   went back a couple of years.

10          THE COURT:  OK.  All right.  Thank you.  That is a

11  very helpful sorting.  Have you now covered all the categories

12  of Rule 16 material?

13          MR. LONGYEAR:  Yes, your Honor.

14          Yes.  And then if we are going to get to post-arrest

15  statements?

16          THE COURT:  Yes.  Go ahead.

17          MR. LONGYEAR:  Mr. Walter made a brief post-arrest

18  that was video and audio recorded, as did Mr. Jordan.

19          THE COURT:  Both recorded by video?

20          MR. LONGYEAR:  Yes, your Honor.

21          THE COURT:  All right.  Thank you.  Very helpful.

22          All right.  Let's focus, first of all, just on the

23  mechanics of discovery.  This is a substantial volume of

24  discovery.  We also have a number of defendants.  They are all

25  in custody, so there is a priority to getting the discovery

Arraignments

1    produced very promptly.

2              How do you envision doing that?

3              MR. LONGYEAR:  Your Honor, the government would

4    request four weeks for discovery, but we would do it on a

5    rolling basis, getting -- we can get discovery both to defense

6    counsel as well as a shared drive at each facility.  I envision

7    the parties would ask your Honor for a protective order

8    relating to some of the items of discovery, in particular the

9    social media evidence, just given that there would be images

10   and videos perhaps of a personal nature that are included in

11   that --

12             THE COURT:  I take it you have in mind the standard

13   protective order that is commonly entered into in criminal

14   cases in the district?

15             MR. LONGYEAR:  That is correct, your Honor.

16             THE COURT:  What discovery among the category that you

17   are talking about is going to take the longest to get?  What

18   I'm trying to do is find a way to front load as much as

19   possible.  What is the hardest to produce here?

20             MR. LONGYEAR:  The most voluminous is obviously the

21   social media evidence, which we are still compiling and we are

22   still waiting on returns for that.  Following that, it would

23   be -- we are compiling the rest of the NYPD reports.  We have

24   to go through that to make any redactions of any identifying

25   information of witnesses.  The remainder we can probably get in

Ibqdjonc
                              Arraignments

1    short order, especially the GPS locations.  We can compile all

2    the warrants obviously in terms of defense counsel promptly --

3               THE COURT:  I take it with each of the areas here

4    which are the product of some form of an application, when

5    you're talking about producing them to the defense, what goes

6    with it is the application, the paperwork that secured the

7    legal authority?

8               MR. LONGYEAR:  Correct your Honor.

9               THE COURT:  Is there any reason why within two weeks

10   you can't produce everything other than the social media and

11   the NYPD reports?

12              MR. LONGYEAR:  Your Honor, the government can get that

13   within two weeks.

14              THE COURT:  All right.  So let me direct you to get

15   all the material other than the social media and the NYPD

16   reports.

17              MR. LONGYEAR:  OK.

18              THE COURT:  And subject to what I hear from defense

19   counsel, I think what I understand you to be saying is those

20   other two categories, you would like to produce those on a

21   rolling basis; you are not going to hold out 'til four weeks if

22   you've got it handy, but you would like the opportunity to

23   produce as late as four weeks because, particularly with one of

24   the accounts being voluminous, it just may take a while?

25              MR. LONGYEAR:  That is correct, your Honor.

Ibqdjonc
                          Arraignments

1          THE COURT:  What about the cell phones that you

2     haven't searched yet?  Where does that fit in in terms of the

3     production schedule?  Just because you haven't searched it, I

4     take it it can still be imaged and produced to the defense?

5          MR. LONGYEAR:  That is correct, your Honor.  Again,

6     some of that depends on the type of cell phone.  I don't have

7     the types of the cell phones handy at the moment, but it

8     obviously depends on which phones we can get into and which

9     ones we actually have to send out to try to get into.  But we

10    would turn those over -- as soon as we image them, we would

11    turn them over immediately.

12         THE COURT:  In other words, you are not going to hold

13    off producing to the defense until you have reviewed it, it is

14    merely a matter of once you have imaged it, whether or not you

15    have made it a priority in terms of your review?  You are going

16    to get it right to the defense?

17         MR. LONGYEAR:  That is correct, your Honor.

18         THE COURT:  All right.  So subject to what I hear from

19    the defense, I think I'm prepared to say that you should get

20    all discovery, save the social media and the NYPD reports, to

21    the defense within two weeks of today, and all remaining

22    discovery, including the social media and the NYPD reports,

23    within four weeks, but I'm going to direct you to produce even

24    those on a rolling basis such that if there are subsets, for

25    example, of social media which you can get now, you should do

                          Arraignments

1    it.

2              MR. LONGYEAR:  Yes, your Honor.

3              THE COURT:  All right.  By what means are you

4    physically going to be producing this substantial amount of

5    material?

6              MR. LONGYEAR:  So that's the rub, your Honor.  I think

7    on something of this size, we would need to get drives from the

8    defendants, just given the volume.  I think in the first subset

9    we may be able to get on discs to get out to defense counsel,

10   but once we get to the voluminous phone dumps and social media,

11   we will probably require external hard drives from defense

12   counsel.

13             THE COURT:  All right.  You should meet with defense

14   counsel today to make sure that whatever the specifications

15   that are required for them to get you the drives, they know it

16   right away so they can get you the drives and you can begin the

17   production?

18             MR. LONGYEAR:  Yes, your Honor.

19             THE COURT:  I would ask you immediately to get a draft

20   protective order to the defense so that that doesn't hold us

21   up.

22             MR. LONGYEAR:  Yes, your Honor.

23             THE COURT:  OK.  May I ask you, without committing in

24   any way, there is a large volume of material that you happen to

25   have received.  Presumably only a subset of it is actually

Ibqdjonc
                          Arraignments

1    germane to the case.  What is the most significant material

2    here?  What are the areas that are the highest priority, if you

3    will, if one were looking to understand the case promptly?  I

4    am trying to give guidance to the defense counsel, who are

5    having a ton of bricks fall on them.

6              MR. LONGYEAR:  Your Honor, I would say it's the

7    surveillance video of all the different acts of violence, the

8    Title III audio recordings, as well as certain of the prison

9    calls which would be identified in terms of who are the

10   individuals are that are speaking.  I think those are probably

11   the priority of the categories of discovery.

12             THE COURT:  All right.  Let me ask you this.  As

13   counsel may or may not be aware, I have had several very large

14   gang cases, a 78-defendant gang case, a 28-defendant gang case,

15   involving categories of discovery that are not dissimilar to

16   those here.  In those cases, I have asked government counsel to

17   make themselves aware on a prompt basis to meet with the

18   defense to help in an informal basis guide the defense through

19   this haystack to find the needles.  In other words, you are not

20   obliged to give up your case, but if there are particular calls

21   that in your view are salient, I am going to ask you to flag

22   them for defense counsel so this doesn't become a game of

23   Where's Waldo.  Everyone has an interest here in moving the

24   case promptly to trial, and that's facilitated by your being

25   collegial with defense counsel and identifying the money items

Ibqdjonc
Arraignments

1   here.

2         MR. LONGYEAR:  Absolutely, your Honor.

3         THE COURT:  All right.  In those cases, given the

4   scale of the case, I appointed a discovery coordinator, Emma

5   Greenwood, and she essentially served as a clearinghouse for

6   government discovery to the defense and digested it and all.

7   Have you given thought to whether this is a case where that

8   makes sense?

9         MR. LONGYEAR:  Your Honor, prior to today's

10  conference, we discussed this option with defense counsel.  I

11  think there is a shared agreement that it may make sense to

12  appoint Ms. Greenwood in this case so that we can then produce

13  discovery to her so that it can then start to be disseminated

14  to defense counsel.

15        THE COURT:  All right.  Formally speaking, she is a

16  member of the defense team.  I don't know what her availability

17  is.  She is presently serving in this role in yet a third case

18  of a rather large, approximately 20-defendant narcotics case,

19  and I believe she is playing that role in other cases in the

20  district.  Formally speaking, she is a member, from a privilege

21  perspective, of the defense team.  Therefore, an application

22  needs to come from the defense if you are seeking the

23  appointment of a discovery coordinator.

24            When we get to the defense, I am going to ask one of

25  you to serve as the coordinating defense counsel, simply

Ibqdjonc
Arraignments

1    somebody who is there to herd cats and get answers when either

2    the government or the Court needs a response.  So, you can all

3    begin to think who wants to volunteer for that role.  But in

4    prior large cases, I have benefited by having somebody serve as

5    essentially the liaison for communications, and it may be that

6    that person is the one who, if there is a joint application for

7    the appointment of coordinating discovery counsel, that person

8    may be the one making that application to me.

9             In any event, I will certainly be receptive to an

10   application like that.  Given the scale of the discovery here,

11   it seems to make sense.  But you should not hold off on your

12   provision of discovery to the defense on that appointment.

13   That may take a little while, and I want defense counsel to

14   start getting Rule 16 evidence promptly?

15            MR. LONGYEAR:  Yes, your Honor.

16            THE COURT:  All right.  Have we covered now all

17   discovery matters, and have you identified all Fourth, Fifth

18   and Sixth Amendment events that you are aware of?

19            MR. LONGYEAR:  Yes, your Honor.

20            THE COURT:  All right.  I mean, I know there are quite

21   a large number of searches and seizures.  You have identified

22   two categories of post-arrest statements.  Were there any

23   identification procedures used here -- lineups, show up, six

24   packs of ID, that sort of thing?

25            MR. LONGYEAR:  Not for these defendants, your Honor.

Ibqdjonc
                          Arraignments

1              THE COURT:  OK.  All right.  Tell me what your

2     anticipation is, government, as to the life cycle of the case.

3     Do you at this point envision a superseder, and if you are not

4     sure, do you have a sense of when you will be sure?

5              MR. LONGYEAR:  Yes, your Honor, we do anticipate a

6     superseder, probably one quite promptly.  I will say we are

7     planning on going today just to add Mr. Martin in with the

8     other defendants.  As well, there is a small typographical

9     error in the Indictment.  We are going to clean that up.  That

10    will happen today.

11             THE COURT:  But that is a more clerical superseder?

12             MR. LONGYEAR:  Yes.

13             THE COURT:  My question is really directed to the

14    scope of the charges.

15             MR. LONGYEAR:  Yes, your Honor.  We anticipate adding

16    a substantive count soon?

17             THE COURT:  A substantive racketeering count?

18             MR. LONGYEAR:  A narcotics count, your Honor, within

19    the next couple of weeks.

20             THE COURT:  Who will be charged in that count, do you

21    presently expect?

22             MR. LONGYEAR:  Mr. Jones, your Honor.

23             THE COURT:  OK.  Other than nonsubstantive changes and

24    other than the addition of a narcotics count, to the extent you

25    can say at this point, are there other changes you presently

Ibqdjonc

Arraignments

1   anticipate in a superseder?

2          MR. LONGYEAR:  Your Honor, it's possible we may add

3   additional acts of violence.  It is possible, but the

4   investigation is still ongoing to certain acts.  So it is

5   possible that there may be additional acts of violence that

6   will be charged.

7          THE COURT:  My experience, to be brutally frank from

8   prior cases and gang cases, is that it is commonly the case

9   that within a month or two of indictment, the government

10  receives accounts from indicted or other persons who are

11  potentially cooperating, which expands your scope of knowledge,

12  and, therefore, at least in prior cases I have had superseders

13  that add other acts that the government was not in a position

14  to prove up.  I don't know whether that is the track that this

15  case is destined to go on.  It may be that nobody here yet

16  knows.  I am not asking.

17          But I would ask you, if that is the direction this

18  goes in, to make that a priority, because I am eager to afford

19  an early trial date.  And so to the extent that there is a

20  prospect of additional substantive counts or elaboration on the

21  existing RICO conspiracy count, for example, to be added, I

22  would rather it be done sooner rather than later so that the

23  charges become fixed sooner rather than later.

24          MR. LONGYEAR:  Yes, your Honor.

25          THE COURT:  All right.  OK.  Very good.

Ibqdjonc
                        Arraignments

1            Counsel, given the number of defendants in this case,

2       this is a case in which I think it is worth my while to set a

3       trial date so that I have the assurance that everyone has

4       preserved the trial date on their schedules and I'm not at the

5       mercy of later commitments arising.  It would have been my

6       expectation that that would have meant a trial date somewhere

7       six months from now, something like April or May of next year.

8            Without talking about specific dates, let me begin

9       with the government and ask if that seems from your perspective

10      to be realistic?

11           MR. LONGYEAR:  Yes, your Honor.  The government will

12      be prepared to proceed in six months.

13           THE COURT:  Defense, without getting into specific

14      dates and just looking directionally at the amount of time and

15      mindful of the liberty interest here with everyone in custody,

16      is that too short, too long, or just about right?  And just

17      give me your name before you speak.  Go ahead.

18           MR. SAPONE:  Edward Sapone for Mr. Walter, who is in

19      the hospital.

20           THE COURT:  Of course.  Just kindly speak into the

21      mic.  Go ahead, Mr. Sapone.

22           MR. SAPONE:  I believe, respectfully, it is too short.

23           THE COURT:  Too short?

24           MR. SAPONE:  Yes, your Honor.  I think the volume of

25      discovery and the type of discovery and the difficulty that

Ibqdjonc
Arraignments

1   we've seen in clients reviewing discovery at the MDC Brooklyn,

2   I'm just afraid that we are not going to be able to get through

3   all of this in a timely fashion to provide effective assistance

4   of counsel.

5        On a side note, I am worried about my client's health,

6   which is not an issue for us to ponder because we don't know.

7   Even without that issue, I just think that all the social

8   media --

9        THE COURT:  Sorry.  Just on your client's health,

10   you're not aware at this point what the issue is and whether it

11   is of a long- or short-term nature, are we?

12        MR. SAPONE:  All I know is that he was shot and I

13   don't know --

14        THE COURT:  Right.  Where was he shot?  What part of

15   the body?

16        MR. SAPONE:  The government may know that.

17        MR. LONGYEAR:  In his stomach, your Honor.

18        THE COURT:  Do you know his condition?

19        MR. LONGYEAR:  I don't.  I found out about the medical

20   condition about 30 minutes before today's conference.  I know

21   he was in the hospital.  Sometime he was discharged, and he was

22   not arrested in the hospital.  He had been discharged.

23        THE COURT:  Sorry.  The shooting was when?

24        MR. LONGYEAR:  The shooting was October 26.

25        THE COURT:  All right.  And he was discharged when?

Ibqdjonc
Arraignments

1      MR. LONGYEAR:  Approximately two weeks, I believe,

2   after that.

3      THE COURT:  All right.  Apparently there are

4   complications that put him back in the hospital.

5      MR. SAPONE:  Right.  I am going to investigate that,

6   obviously.  But, your Honor, regarding the type of discovery,

7   just the volume of the social media, it's been my experience

8   that at the MDC Brooklyn, there is limited access to the

9   computers on which they review the discovery, and then there

10   are always a whole host of problems.  And then we get CorrLinks

11   emails and we go visit the clients, and it is never a smooth

12   transition when it comes to this type of discovery and this

13   volume.  And that's my concern with that month as a prospective

14   month for trial, your Honor.

15      THE COURT:  All right.  Thank you.

16      Any other defense counsel want to speak?  That is

17   Mr. --

18      MR. LEEMON:  Mr. Leemon.

19      THE COURT:  Sorry.  Mr. Leemon.

20      MR. LEEMON:  Yes.  Your Honor, I join in Mr. Sapone's

21   request.  My experience in these racketeering type cases,

22   especially with clients that are detained, six months a little

23   short.  I would suggest a fall date.

24      THE COURT:  Any other defense counsel?  Anyone else

25   want to speak?  Sorry, that is Mr. Maher?

Ibqdjonc
                          Arraignments

1              MR. MAHER:  Maher.

2              THE COURT:  Maher, sorry.

3              MR. MAHER:  I just join the comments of co-counsel.  I

4    think that the fall would be appropriate for this type of case

5    and the volume that we're hearing and the number of different

6    formats of the different electronic media that are going to

7    have to be dealt with as well.

8              THE COURT:  Any other views on this subject?  Anyone

9    take a different view?

10             Let me just go and make sure I have heard from

11   everyone.  I have heard from counsel for Mr. Jones, Mr. Jordan,

12   Mr. Butler.

13             For Mr. Hernandez, that's Mr. Lazzaro?

14             MR. LAZZARO:  Yes, your Honor.

15             THE COURT:  What is your view?

16             MR. LAZZARO:  We take no position.

17             THE COURT:  Do you oppose your --

18             MR. LAZZARO:  I am not opposing co-counsel's

19   application.

20             THE COURT:  All right.  And I've heard from Mr. -- I

21   think I've heard from everybody, correct have I not heard from

22   any --

23             MS. FERRONE:  Diane Ferrone for Mr. Jones.

24             I think we take the position that a fall trial date

25   gives the parties sufficient time to review the discovery.

Ibqdjonc
                          Arraignments

1              THE COURT:  Counsel, if I accommodate a fall trial

2     date, subject to any bail appeals, at least if the magistrate

3     judge's present determination stands, your clients are in

4     custody from early last week, I gather, through, you know, the

5     beginning of a trial that might last several weeks.  You know,

6     we're talking about your clients being in custody for 10/11

7     months between arrest and the conclusion of trial.  Is that

8     something you have discussed?

9              MS. FERRONE:  Understood, your Honor, but I think the

10    difference between a May date and a fall date of three to four

11    months is in the best interest of our clients and their defense

12    in having that additional time to review discovery and prepare

13    motions, and it may just seem a quick turnaround in light of

14    the volume of discovery and the motions that will likely be

15    made.

16             THE COURT:  Just a show of hands, have all of you

17    discussed the timetable of the case with your clients so as to

18    confirm that your clients are on board with a ten-month,

19    nine-and-a-half month wait until the beginning of trial?

20             MS. FERRONE:  I have not, your Honor.  I think most of

21    us only heard about the volume of discovery right here right

22    now, so of course we haven't had an opportunity to confer with

23    our clients.

24             THE COURT:  Anyone from the defense take a different

25    perspective on what was just said?  Same situation for

Ibqdjonc
Arraignments

1   everyone?

2           MR. LEEMON:  Can we maybe have a moment to talk --

3           THE COURT:  I am just asking you right now whether you

4   have yet conferred with your client.

5           MR. LEEMON:  I spoke to him, but he just said he wants

6   to talk to me for a second.

7           THE COURT:  Hold on a moment.

8           It is challenging in a large courtroom to start having

9   individual breakout conversations.  I don't think that is quite

10  workable in this environment.

11          MR. LEEMON:  I think that the fall trial date is

12  appropriate --

13          THE COURT:  Let me -- look, I am sensitive to the

14  liberty interests here.  We've got five people right now who

15  are in custody, and they are not sure whether there will be an

16  incremental custody created for Mr. Lovick insofar as he may

17  already be separately detained pursuant to another court's

18  order, but I am mindful of the liberty interests.

19          The other prospect would be to do this, let's say, at

20  the beginning of July, which splits the baby some, and results

21  in about eight-and-a-half months between arrest and trial but

22  at least limits the intrusion on the liberty interests some.

23          Views about that?

24          MR. MAHER:  Yes, your Honor.  I stand by our request

25  for the fall.  That is less than a year.  In my experience,

Ibqdjonc
Arraignments

1    some of these cases take two to four years to get to trial.

2              THE COURT:  Right.  My job here isn't to mirror what

3    has happened in some other case where there was a big intrusion

4    on liberty interests.  I'm trying to respect the speedy trial

5    concept.

6              MR. MAHER:  Exactly.

7              THE COURT:  And I'm trying to understand what the

8    problem would be, let's say, with a trial that begins, let's

9    say, right after the July 4th holiday, which gives, you know,

10   you from late November through and until the end of the first

11   half of next year to get ready.  What is the problem with that?

12             MR. MAHER:  Your Honor, I guess the perspective that

13   I'm trying to express is that I'm looking out for the liberty

14   interest of my client who is facing potentially a mandatory

15   minimum of 32 years in prison if he loses at trial.  And so

16   that extra two-and-a-half months from July to the fall makes a

17   significant difference for the defense, CJA-appointed, in order

18   to go through the material with the level of meticulousness

19   that is needed to make sure that my client gets a fair trial

20   that he can show that he is innocent of these charges.  That is

21   something that I have discussed with my client, and we are on

22   board with that.  And I think it meets all of the standards

23   under the Speedy Trial Act.

24             THE COURT:  Mr. Sapone.

25             MR. SAPONE:  Yes, your Honor.  For me, the biggest

Ibqdjonc
                        Arraignments

1   issue is the problem at the MDC reviewing the volume of

2   discovery.  So, I'm part of defense organizations and I'm on

3   certain list service, and sort of the ticket item of the day

4   that if we go to the MDC and we hear from our clients that they

5   cannot get through the discovery because there is a -- so, one

6   problem or another of getting to a computer and then once they

7   get to the computer, there are issues with the discovery

8   itself, it is never a smooth transition.  So if my client were

9   home and can come to my office and we could burn the midnight

10  oil, I wouldn't have as much of a concern.  But given that he

11  is currently incarcerated and what we just heard as to the type

12  and volume of discovery, I join in the application.  I think

13  the fall is appropriate.

14          THE COURT:  Mr. Leemon.

15          MR. LEEMON:  My client is fine with the fall date.  I

16  just --

17          THE COURT:  You've nonverbally communicated?

18          MR. LEEMON:  Correct.

19          THE COURT:  All right.  One moment.

20          (Pause)

21          All right.  Does anybody object to my scheduling a

22  trial date that would have jury selection and trial beginning

23  the week of Labor Day?

24          (Pause)

25          No objection from the defense.

Ibqdjonc

Arraignments

1          MR. LEEMON:  No, your Honor.

2          THE COURT:  Government?

3          MR. LONGYEAR:  No, your Honor.

4          THE COURT:  All right.  Look, while it would have been

5     my preference to have trial somewhat earlier, in the end

6     defense counsel as one are asking me for a September trial date

7     and are articulating good reasons.  The volume of discovery is

8     unusually large.  It's multimedia.  It's in a variety of

9     different formats.  There is every reason to assume that at

10    least as to some of these formats, there may be some challenges

11    gaining access.  The government is already having some

12    difficulty gaining eyes on-- viewability on some of these

13    materials.  And what Mr. Sapone describes to me in terms of

14    challenges at the MDC aligns with the experience I have had in

15    the two large gang cases I have had where there has been need

16    for counsel collegially to intervene sometimes with MDC or MCC

17    authorities to make sure that there are workable monitors and

18    enough time allocated so that the defendants can gain access to

19    the material.

20          Look, it's my hope that the process of informal

21    conferral between the government and the defense will allow

22    everyone to focus their attention on the subset of the large

23    volume of discovery that actually matters here.  In that sense,

24    the volume stated may overstate the review time.  In other

25    words, the government is obliged under Rule 16 to turn over all

Ibqdjonc
Arraignments

1    of these materials, but just because they are backing up a dump

2    truck to your house and unloading all of this stuff doesn't

3    mean that all of it is ultimately high value material.  And it

4    is my hope that through joint defense discussions but also

5    through reverse proffers, if you will, from the government, the

6    defense will have more of a search light to go through the

7    material.  But with that, I will be happy to put this down for

8    trial beginning Wednesday, September the 4th of 2019.

9          That requires all of you to protect that date, and

10   realistically I will find out in a moment the anticipated

11   length of trial.  But that means that all of you need to be

12   available, and you need to protect that timeframe as against

13   other commitments.

14         Defense counsel, anybody have a commitment right now

15   in September 2019 that prevents a trial from being held then?

16         MR. SAPONE:  No, your Honor.

17         THE COURT:  I will take that as a collective no.

18         Government, it is my practice not to hold a trial with

19   more than approximately five defendants being tried at once.

20   That being said, even in those large cases that I have

21   described earlier, the natural process of pleas, including by

22   cooperating witnesses, has led to the body of defendants

23   shrinking to below that number as a practical matter.  So I am

24   going to operate on the assumption for now that we have a

25   single trial.  Let's assume we have a single trial of about

Ibqdjonc
                              Arraignments

1   three to four defendants from this group just to make, you

2   know, a conservative estimate.  What is your realistic

3   assessment of the length of trial?

4              MR. LONGYEAR:  I think approximately three weeks, your

5   Honor.

6              THE COURT:  All right.  So realistically counsel need

7   to set aside at least the month of September.

8              MR. LONGYEAR:  Yes, your Honor.

9              THE COURT:  And jury selection, given the nature of

10   the case, has the potential to go a little bit longer than the

11   norm.

12              All right.  So I am going to set this down for trial

13   on September the 4th.

14              I think the next issue then involves setting a next

15   conference date, and given how far off we've put the trial, the

16   next conference date can probably be a little farther off than

17   anticipated.  Here's what I would like to do.  Put assigned the

18   T III, put aside the wiretap, and the reason I want to put that

19   aside is because motions to suppress wiretaps are by their

20   nature a far more complicated undertaking than other forms of

21   suppression.  I am not at this point setting any schedule for

22   that, and nobody ought to feel under any pressure to move with

23   respect to that.  It's generally been my practice that it is a

24   good thing, though, to litigate more garden variety Fourth or

25   Fifth Amendment issues relatively early in the case.

48

Ibqdjonc
                              Arraignments

1              Is there any reason why if we set a next conference

2     date for late January, a date to be determined, defense counsel

3     can't be in a position by that date to let me know which, if

4     any, Fourth or Fifth Amendment events in the case -- searches,

5     seizures, post-arrest statements -- they intend to move to

6     suppress?  I would then use that conference to dig a little

7     deeper, understand more what you have in mind, and make an

8     assessment as to whether in fact it makes sense at that point

9     to promptly litigate those items or whether, given the

10    potential direction of the case, including as relating to that

11    defendant, it makes more sense to defer motions to suppress.

12             Any reason why by late January you won't be in a

13    position to commit to what items you are moving to suppress, if

14    any?

15             MR. LEEMON:  Assuming we get the discovery and have no

16    issues, I think that should be fine.

17             THE COURT:  I would think so.

18             Anyone else?

19             All right.  Mr. Smallman, let's -- I have a long trial

20    beginning the last few days of January so I'm thinking we are

21    looking at the third week of January.

22             MR. LEEMON:  I am away that week, your Honor.

23             THE COURT:  One moment.

24             (Pause)

25             Sorry, that's Mr. Lehman?

Ibqdjonc
                            Arraignments

1          MR. LEEMON:  Yes.

2          THE COURT:  All right.  Look, in the end I need to

3    come up with a workable date.  We have a lot of defense

4    counsel.  I'm sure that you can have somebody stand in for you.

5          MR. LEEMON:  Absolutely.  We have discussed it with

6    us, and January 29th, if it is possible --

7          THE COURT:  I am on trial.  I've got a many defendant

8    case beginning January 28th.  That won't work.  That's why I am

9    proposing we do it the week before.

10         (Pause)

11         How about Friday, January 25th, at 10:30 a.m.?

12         MS. FERRONE:  Fine with us.

13         MR. MAHER:  One issue.  I have a trial schedule that's

14   set, and that has been set aside as a motion hearing date if I

15   have a motion hearing set for that date.  I'm unable to say at

16   this point whether I will be engaged.  It is likely I don't

17   think I will be, but I think I have to keep that open.

18         THE COURT:  That specific date?

19         MR. MAHER:  That date --

20         MS. FLORIO:  I as well, your Honor.

21         THE COURT:  All right.  One moment.

22         (Pause)

23         How about on January the 22nd at 2 p.m.?

24         MS. FLORIO:  Perfect.

25         THE COURT:  I think the only person I might lose then

Ibqdjonc
                              Arraignments

1    would be Mr. Leemon?

2              MR. LEEMON:  That is correct but I will find someone

3    to cover.

4              THE COURT:  Very good.  Look, it is a status

5    conference.  The important thing that I would need to know then

6    is I will be asking every defense counsel, putting aside the

7    Title III, to commit then and there to any suppression motion

8    you intend to make and be in the position to describe for me

9    what you are moving to suppress and, with some specificity, on

10   what basis.  And that way I can make sense of the efficiency or

11   not of holding a suppression hearing sooner rather than later.

12             So, we will schedule next conference then for January

13   the 22nd at 2 p.m.

14             All right.  Having then taken care of that, let me

15   open the floor to other issues.  I will begin with the

16   government.  I've gone through a host of issues in the case.

17   Is there anything else the government wants to raise today?

18             MR. LONGYEAR:  Only exclusion of time, your Honor.

19             THE COURT:  We will get to that at the end, but thank

20   you.

21             Let me go down the line with defense counsel and find

22   out if there are any concerns/issues you need to raise.  Let's

23   begin with Mr. Jones' counsel, Ms. Ferrone.

24             MS. FERRONE:  Yes, your Honor, just a general

25   question.  If we are making an initial bail application, would

Ibqdjonc
Arraignments

1  we make to that to your Honor or the magistrate court?

2          THE COURT:  Given that the case is indicted already,

3  you can make it to me.  But before you do that, I take it that

4  your client's detention was on consent?

5          MS. FERRONE:  That is correct, your Honor.

6          THE COURT:  All right.  What I would ask you to do

7  is -- in that case the transcript from the magistrate's court

8  is unimportant if there wasn't a controverted issue.  I will

9  need to get the Pretrial Services' report, and in order to

10  facilitate my review, let me just ask for a brief exchange of

11  letters from both sides.  So, contact Mr. Smallman.  We will

12  put it on the calendar promptly, and I will ask then just to

13  get a short letter from each side so that I come to the

14  individual hearing with some sensitivity of the facts and

15  circumstances key to your client.

16          MS. FERRONE:  Thank you.

17          THE COURT:  But I am happy to hold those as soon as

18  needed.  I understand the liberty interests at stake.

19          MS. FERRONE:  Thank you, your Honor.

20          THE COURT:  Mr. Lehman, anything you want to raise?

21          MR. LEEMON:  Just one question with regard to Title

22  III's.  Are there transcripts, draft transcripts, or any of

23  that that the government is going to be --

24          THE COURT:  Government, are there lines sheets?

25          MR. LONGYEAR:  Yes, your Honor.

Ibqdjonc
                          Arraignments

1           THE COURT:  All right.  But nothing more than that?

2           MR. LONGYEAR:  Yes.  At this point just the audio and

3    the line sheets.

4           THE COURT:  OK.  There is your answer.

5           Anything else from you, Mr. Leemon?

6           MR. LEEMON:  No, your Honor.

7           THE COURT:  All right.  For defendant Butler,

8    Mr. Maher, anything from you?

9           MR. MAHER:  Maher.  No, your Honor.

10          THE COURT:  Maher.  Sorry.  By trial I will get that

11   right.  OK.  Forgive me.

12          For Mr. Hernandez, Mr. Lazzaro, anything to raise?

13          MR. LAZZARO:  Not at this time, your Honor.

14          THE COURT:  All right.  And for Mr. Walter,

15   Mr. Sapone, anything from you?

16          MR. SAPONE:  No.  Thank you, your Honor.

17          THE COURT:  Let me just ask, putting aside the

18   application for bail that I think -- let's see.  Who was it?

19   Was it Ms. Ferrone?

20          MS. FERRONE:  Yes, your Honor.

21          THE COURT:  That you indicated you might make, is

22   there any other defense counsel who at this point is

23   contemplating a bail application?

24          MR. LEEMON:  I am contemplating it.  I still need to

25   go over it with my client.

Ibqdjonc
Arraignments

1            MR. SAPONE:  Yes, your Honor, on behalf of Mr. Walter.

2            MR. LAZZARO:  For Mr. Hernandez, I would say yes, your

3    Honor.  I have to order the transcript front Magistrate Pitman.

4            THE COURT:  Right.  My understanding is that

5    Mr. Hernandez was the only defendant as to whom there was

6    argument as to detention or not, correct?

7            MR. LAZZARO:  Correct.

8            THE COURT:  So for him in particular, before there can

9    be a bail appeal, since I am reviewing a decision below, I want

10   to receive the transcript.  So what I would ask is get with

11   Mr. Smallman, schedule a date for the bail hearing, and then

12   get me the transcript from below, the Pretrial Services report,

13   and a short letter from each side, but I am happy to do it very

14   promptly.

15           MS. FLORIO:  Thank you, your Honor.

16           MR. LAZZARO:  Thank you.

17           THE COURT:  Sorry.  Go ahead.

18           Anyone else?  Mr. Maher.

19           MR. MAHER:  Mr. Maher for Mr. Butler.

20           Yes.  Thank you.

21           THE COURT:  It looks as if -- did I capture that

22   everybody here is at least reserving their right to challenge

23   the bail determination?

24           MR. MAHER:  Yes, your Honor.

25           MS. FLORIO:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ibqdjonc
Arraignments

1          THE COURT:  So please reach out to Mr. Smallman as

2     soon as you can.

3          Anyone else at the defense table have anything else to

4     raise?

5          MR. MAHER:  Just whether you are going to -- I assume

6     your Honor is going to circle back to the coordinating

7     discovery.

8          THE COURT:  Yes.  Thank you.

9          Do I take you, Mr. Maher, to be volunteering?

10          MR. MAHER:  I felt that happening as I stood up, your

11     Honor.

12          THE COURT:  No good deed goes unpunished.

13          All I'm looking to do is depending on how things play

14     out, there may be a value, particularly before we have a

15     coordinating discovery counsel and the government having one

16     person with whom we can reach out to for common issues, beyond

17     that there may be a need for the Court to do so.  So, let me

18     just ask you to take the responsibility of being the

19     coordinator, get everyone's emails together, and I appreciate

20     your doing that.

21          MR. MAHER:  Absolutely.

22          THE COURT:  Anything else from the defense?

23          MR. LEEMON:  Do you want us to make an application for

24     the discovery coordinator?

25          THE COURT:  You need to do it in writing.  Please do

Ibqdjonc
                          Arraignments

 1    so.  Look, you can expect that I will almost certainly grant

 2    it, because this is an eerily similar situation to other cases

 3    in which I have been happy to grant it.  But there formally

 4    needs to be a written application.  You know, if you reach out

 5    to Jerry Tritz, who works for the court -- you know him -- and

 6    he handles CJA matters, he almost certainly will have a model

 7    form for you.

 8              MR. LEEMON:  Some of us are retained, some are CJA.

 9              THE COURT:  Right.  You are above my pay grade in

10    terms of how the discovery coordinator works in connection with

11    that.  In the prior cases that I have appointed a discovery

12    coordinator, I believe every defendant was CJA.  Jerry Tritz

13    will be able to work with you on that.

14              MR. LEEMON:  OK.

15              THE COURT:  Thank you.

16              Is there an application for the exclusion of time?

17              MR. LONGYEAR:  Yes, your Honor.  The government would

18    move to exclude time between today and September 4, 2019, to

19    allow the government to begin production of discovery, to allow

20    defense counsel to begin reviewing that discovery, contemplate

21    any motions that may be made, and also to facilitate the

22    parties' discussion about potential pretrial dispositions.

23              THE COURT:  Is there any objection?

24              ALL DEFENSE COUNSEL:  No, your Honor.

25              THE COURT:  On consent, I'm going to exclude the time

Ibqdjonc
Arraignments

1   between now and September the 4th, 2019 from the running of the

2   speedy trial clock pursuant to Title 18, United States Code,

3   Section 3161(h)(7)(A).   I find that the ends of justice

4   outweigh the interests of the public and the defendants in a

5   speedy trial.   In this case, the defendants' interest is in

6   fact, as uniformly articulated by defense counsel, in having

7   enough time to master the rather substantial volume of

8   discovery in this case.   So, first and foremost, I am excluding

9   the time to enable the defense to master this variegated and

10  dense set of material.   I am also mindful of the practical

11  problems that Mr. Sapone and others have described at the MDC

12  of making sure that individual defendants get meaningful access

13  to the material, and, regrettably, that means that there is a

14  longer schedule than I would have wanted here, but it is

15  ultimately in the interest of a fair trial, assuring that

16  defense counsel and the defendants have access to the material.

17          The exclusion of time is also important to allow

18  defense counsel to assess whether there are viable suppression

19  motions to be made, whether there are viable challenges that

20  can be made to the Title III in this case.

21          Finally, as counsel indicated and as I indicated

22  earlier, the exclusion of time here makes sense given the

23  realistic likelihood that some, maybe all defendants will at

24  least have discussions through counsel with the government

25  about the possibility, on whatever the terms, of a potential

Ibqdjonc
                              Arraignments

1    pretrial disposition.  Experience in cases like this teaches me

2    that there is often very prompt attempts by defendants to

3    proffer with the government.  I want to make sure that on

4    whatever schedule those discussions may be had, I have given

5    enough time for informed discussions between defense counsel

6    and the government and any proffers that may be appurtenant to

7    that.

8              So, for all of those reasons separately and together,

9    I find the exclusion warranted under the section I read.

10             All right.  Anything further from anybody?

11             MS. FLORIO:  No, your Honor.

12             THE COURT:  Thank you.  We stand adjourned.  I will

13   see you in late January.

14             (Adjourned)

15

16

17

18

19

20

21

22

23

24

25